January 3, 2001

Attn: Inspector General

From: Ken Preston
PDR, Inc.
54 Adams Street
Foxboro, MA 02035

Subject: Request for an Investigation

Dear Madam/Sir,

Please accept this letter as a request for a thorough investigation of a conduct of certain AFRL's employees and affiliated companies, which resulted in violation of my constitutional rights, theft of my property, dissemination of proprietary information, breach of my contract with the US government and assassination of my character. Additionally the willful acts to inflict harm were done. Last year we presented AFRL/JAZ, an amount certain document of $229,000.00 spent by this corporation on their research programs. This means that AFRL/JAZ is fully aware that their actions have cost this corporation a significant amount of money and have created a severe hardship upon our families.

The persons and companies in question are as follows: Dr. Michael N. Alexander, Mr. M. Suscavage, Mr. D. Bliss, Mr. M. Harris and Mr. A. Drehman all present or former employees of AFRL; Mr. J. Bailey and Mr. M. Callahan Both employees of Solid State Scientific Corp.; and Solid State Scientific Corp. where some of the former AFRL's personnel are now employed.

The actions of the above-mentioned individuals and company negatively impact on our current effort to commercialize the technology that was developed under the two consecutive CRADA agreements since 1996. These actions, in our opinion, also undermine the US government's effort to facilitate technology transfer into the commercial marketplace guided by a number of relevant federal statutes and severely taint the US government's institutions mandate to be impartial and fair in allocating financial, technical and intellectual resources among participating companies and individuals.

<u>Background:</u>

USAF CRDA No. 96-RL-07 dated May 22, 1996 and Amendment 1 dated May 21, 1997 were signed between PDR, Inc. and AFRL for the main purpose of ultimately commercializing technology dealing with gallium nitride (GaN).

During the period from October 1996 to April 1997, PDR independently developed a unique method to produce GaN sputtering targets. AFRL enthusiastically accepted two

targets, one in May 1997 and the other in October 1997, for characterization and assessment of their applicability for deposition of GaN thin films. Based on the information supplied to us by AFRL, we filed a patent application on December 24, 1997. Under the terms of this CRADA agreement the Air Force was notified that the patent application was filed. The patent No. 5,942,148 was approved on August 24, 1999.

There were no identified disputes; no misunderstandings and no controversies with respect to the work being performed under the CRADA; and it appeared that both sides were extremely excited by the initial results. Both PDR and AFRL have agreed to the public release of some of the work performed under the CRADA, through the AFRL presentation at the MRS Conference on December 5, 1997. The apparent opportunities from this discovery lead to PDR with the approval of AFRL retaining a former Air Force attorney. This attorney was paid by this corporation and had a mandate to guide our joint efforts to it highest potential. Both sides were discussing opportunities for an additional funding through SBIR and STTR proposals, all the intellectual, financial and marketing data considered proprietary were made available to AFRL under the agreement, and I personally invested an additional $80,000 based on very favorable reviews by the AFRL personnel. During the same time, a consolidation of my other CRADA agreements (three in total) was implemented to help AFRL in reorganization of its activities. The proprietary plasma system built at AFRL's premises was an essential part of other CRADA efforts elsewhere and was so identified in one of the other agreements with AFRL's amendment. All these efforts were being funded exclusively by PDR.

On January 13, 1998, Mr. Suscavage after seven exclusive months abruptly stated that the targets didn't work. This is a day before a submission of the SBIR proposal, which was jointly prepared by both sides. At that moment, all lines of communication regarding this matter were shut down. It was, and is our position that all technical information and any inventions made by the same employees performing work under the CRADA should be disclosed to PDR in order to make determination whether or not I may have contributed to these inventions and/or if PDR should request a license from the government for such inventions. AFRL never fully complied with those requests to this day. This was a clear breach of contract as defined by the CRADA agreement. Mr. Drehman notified us that patents were being submitted on technology derived from the use of our targets.

There was a lot of excitement about our technology by third parties. Mr. Colin E. C. Wood of the Office of Naval Research personally endorsed our technology and offered his support in finding funding sources to advance its further development, which by the way AFRL was always promising but never did. His involvement led to contacts with university and government research centers prominent in GaN research. A total of three joint research and development proposals with third party institutions (Boston University, Stanford University and Idaho National labs) were written. Again all the proprietary information was made available to the AFRL as we always identified ourselves as working jointly with the AFRL.

In response Dr. Alexander's (Chief, EM Materials Branch, Electromagnetic Division, Sensors Directorate, Air Force Research Laboratory) email of 12 March 1998 to Colin E. C. Wood of the Office of Naval Research, with a copy to Mr. Preston states:

…Our CRADA work with Ken Preston's company is designed to determine how useful his GaN pucks are for PLD and sputtering and – equally important to provide an environment in which, without damaging the reputation of his product, he has opportunities to correct shortcomings we may discover…

In a further email of 12 March 1998 from Dr. Alexander to Mr. Preston, Dr. Alexander states:

…Obviously, we would like the first opportunity to work with your targets, be the first people to publish reports of high quality GaN deposited by sputter an PLD techniques, and get legitimate credit for helping bring GaN target technology to fruition. However, the targets are yours, not ours. Although we've shared our thoughts about using the CRADA and our lab as a test bed for your target, prior to widespread distribution, you ultimately are the only person who can make business decisions in what you consider the best interests of your company…

It is quite apparent from the above that no questions existed with respect to PDR's GaN targets and their relationship to the CRADA.

In April 1998, Drehman presented very promising results on of-axis deposition of GaN thin films using the PDR target at the Air Force Headquarters. These results were an integral part of our STTR proposal with Stanford University.

In April 1998, Mr. Suscavage returned one of our targets. This target had a hole in it and clearly indicates that Mr. Suscavage extensively used it past January 13, 1998. Mr. Drehman disclosed that at least 25 depositions were performed by AFRL with our targets. We never saw any results from this work.

On June 14, 1998, Mr. Stan Collier officially notified us that our CRADA is being suspended and that our targets were never under the scope of the CRADA agreement and is being considered as gifts to AFRL. I was denied access to the premises. All my property was seized, including the plasma system. The inability to utilize this plasma system led to suspension of other CRADA agreements, which relied on this system for crucial depositional work. The above mentioned STTR proposals never saw a light of the day despite their originality and involvement of very prominent researchers.

Now within the benefit of hindsight we believe AFRL made everything in their power to stop our commercialization effort and inflict harm.

A month later Dr. Drehman signed a new CRADA agreement with NZ Applied Technologies Inc. It is illegal to have two CRADA's with two different companies working in the same field by the same personnel. Or our CRADA unjustifiably was

suspended to clear the way for unlawful transfer of our trade secrets and technology to another company?

Following many months of back and forth correspondence, I received the letter from Major General Richard R. Paul dated October 20, 1998, which stated his confidence in AFRL's intentions to resolve pending issues in good faith by the end of October 1998. Dr. Alexander responds and reiterates his initial position that targets were outside of the CRADA and that the suspension of the agreement stands.

I had no choice but to respond with an invoice to cover my expenses on targets and in addition demanded payment for targets usage by AFRL. Why AFRL, expected to have a valuable piece of property not covered by any agreement, as they insisted at the time, free? I also demanded the return of my second target and the plasma system, which were still in the possession of the lab.

In December 1998, I found an abstract by Dr. A. Drehman to be presented at MRS meeting in Boston that same month. Please note that it was submitted no later than July 1998, my target was used, and no acknowledgement of our involvement, and all the while AFRL was maintaining that targets are useless. Later AFRL choose not to proceed with the actual presentation.

In January 1999, Mr. Stan Collier called and suggested to put all the work under the extended old CRADA agreement. This decision was probably the result of some pressure from the Air Force Headquarters. Next many months saw continued delays and back and forth correspondence. On March 4, 1999, at the meeting with Dr. Alexander I was offered a license to a technology, which was not patented yet, as compensation. Dr. Alexander stated that he is not acknowledging my previous invoices and returned my second target.

In April 1999, patent applications (AFB 00437 & AFB 00473) were filed and stated that the results of laser ablation depositions using my targets were unsatisfactory. This statement was later amended on my insistence.

During the same month, both AFRL's legal team and I were stunned to learn that Solid State Scientific Corp. had a license to practice this invention. AFRL made a contractual commitment to revoke Solid State's License. On September 5, 2000, the exclusive license for the above-mentioned patents was signed. One of those patents No. 6,113,985 was issued on September 5, 2000, which triggered our exclusive licensing period. The other is still not issued and we do not know the reason for this delay.

The repeated attempts by the AFRL's legal department to revoke Solid State's license failed. Dr. Alexander complained that Solid State is subjected to undue pressure and stated that this company works for him defending their refusal to surrender the license. Solid State Scientific Corp. is an on site AFRL's service contractor. It is being paid to perform certain work on behalf of the AFRL. This company has an access to proprietary information of all other entities engaged in collaboration with AFRL. As such it has

amicably and directly with AFRL. Our latest two requests to correct wrongdoing were ignored.

I was trying to give you a scope of the issues in a very compressed form. If you require any additional information or clarification, please do not hesitate to call me at 508-543-4052.

Thank you

Kenneth Preston

Kenneth Preston
PDR, Inc.

ATTACHMENT 1

October 27, 2000

Attn: Julian Siegel Esq. Chief JAZ
ESC/JAZ
40 Wright Street
Bedford, MA 01731-2903

From: Ken Preston
PDR, Inc.
54 Adams Street
Foxboro, MA 02035

Subject: Offer to Resolve Dispute

Dear Julian,

Please disseminate this letter to the parties concerned including but not limited to Dr. Payne and his group and Solid State Scientific Corp.

In June 2000 PDR, Inc. had been granted an exclusive license to commercially develop a novel group-III nitride technology. This legal document is a result of two CRADA agreements PDR, Inc. had with Air Force Research Laboratory (AFRL) during the past 5 years. At this very moment, PDR, Inc. has only information provided by the Air Force regarding said technology, all publicly disclosed. Two pieces, One a summary on off-axis sputtering deposition experiments using my own GaN target presented to me in May 1998. The other is a paper published by AFRL in October of 1999. In both of those publications, there are clearly stated intentions to continue research and development effort on further improvement of the technology. Our repeated requests for data were denied and we were told to use the Freedom of Information Act to access this information. CRADA legislation binds the government from releasing research information obtained under CRADA to third parties, not to the party of the agreement itself.

To preserve the spirit and intention of the technology transfer process, PDR, Inc. should be able to access AFRL's expertise, know-how and data along with technical support and open lines of communication in order to be able to raise serious venture capital aimed at commercialization of this technology.

In May, 2000 Solid State Scientific Corp. surprisingly surfaced as a commercial entity claiming a non-exclusive commercial license in contradiction to PDR's exclusive licensing agreement with the US government. Repeated attempts to revoke Solid State's license had failed.
We respect contribution of all involved in the development of the technology and would like to see them being rewarded financially and otherwise through a successfully implemented commercialization effort. Therefore, we propose the following:

- Since, as far as we are concerned, Solid State and AFRL is the same, we are inviting Solid State and this laboratory to join us in the exclusive commercialization effort. We will need to work out with them a favorable solution.

- Irrespective of the Solid State's decision, we expect full and unconditional disclosure of all the information pertaining to the technology in question including the issues related to the enhancements and new uses of the technology and protection of proprietary information.

- Since exclusivity of our license is being jeopardized, the license period should be extended accordingly.

- If my personality is an insurmountable obstacle to reaching an amicable agreement, I am prepared to step aside and designate another person to lead the effort.

- We allow 5 (five) business days following the date on this letter for the response to this proposal.

- We allow the next 30 (thirty) business days to workout details of the new agreement.

At this point in time, our commercialization effort is well underway, but we feel it is being undermined. The license without technical information, support, open lines of communication have little commercial value. On top of that we have reasons to believe that actions of some of AFRL's employees caused the following: exclusiveness of the technology may have been violated, additional patents are being or will be filed without disclosure to PDR, Inc., intentional delays in resolving arising issues are being created in order to create conditions to take PDR's license back, my character is being attacked, validity of the technology is being questioned, negative remarks about my relationship with AFRL are being made, the technical information we were given is incomplete, the conflicts of interest were created.

If indeed the Air Force is truly honoring the license and committed to the technology transfer it is not unreasonable to expect the resolution of the above mentioned issues in a prompt and timely fashion. Our commitment to the commercialization process is unconditional and we feel that speedy action aimed at resolving outstanding issues is in the best interest of all involved.

Thank you

Kenneth Preston

Kenneth Preston
PDR, Inc.

I am requesting that this letter be placed in the file for future reference.

I feel one of our next major obstetrical will be dealing with the second patent, which still has not received its first office action and its allowance will not issue before our option to exercising the license for another year, if we elect to do so.

Since Dr. Alexander's has been making the decisions of what and when to accept something and after learning of Solid State interests to commercialize the same technology it appears a conflict is eminent. In addition, if we consider Solid State Corp commercialization intent and as a competitor, it is in their interest to establish proprietary process, file blocking patents or prolongs the issuance date.

I am requesting this letter be placed in the file for future reference if the need arises

Thank you

Kenneth Preston

Kenneth Preston
PDR, Inc.

ATTACHMENT 2

September 15, 2000

Attn: Julian Siegel Esq. Chief JAZ
ESC/JAZ
40 Wright Street
Bedford, MA 01731-2903

From: Ken Preston
PDR, Inc.
54 Adams Street
Foxboro, MA 02035

Subject: Summary

I have constructed this background section to serve as a review from September 1999 to the present. If "you" feel there are inappropriate statements, let me know and I will make the change.

I am not an Attorney and rely upon the facts regardless of the legal issues. Since I have made it a point to only communicate with you and Stan Collier, who has since retired and replaced by Tom S, each time new information surfaces it never falls to shock and amaze me.

**Background:**

*March 1999*

From the initial meeting in March through Oct 1999, a great deal of time was spent jointly compiling and reviewing information that we could agree on. The first of these was collecting the data, having it reviewed and approved. This lead to the creation of a data package approved by Alexander and used in our development plan.

*Oct 1999 – March 2000*

We worked under a mini- 6-month CRADA to create a development plan and finalize a technology licensing agreement. Alexander's group provided six micro crystals for evaluating the technology. Mr. Harris later provided a small bottle of the material, retired and returned in March 2000 working for Solid State Scientific Corp.

We received in Feb 2000, a copy of a paper, presented at the Material Research Society Conference in Dec 1999, by Alexander's group and Solid State. Also we where notified

the target patent was allowed. There is still no word on the second patent file at the same time.

*April 2000 – present*

The development plan was completed and sent to AFRL Headquarters. It was returned authorizing Dr. Pyans to sign the licenses.

We were notified, the technology section was missing. A new copy was provided and a two-month clarification effort took place.

The returned package also contained information on the Patents inventors and assignment. Reviewing this material, it was discovered Solid State Scientific Corporation had been granted a nonexclusive license in April 1999.

A request for commercialization activities was sent to Solid State before revocation. With a 30-day response window.

We reviewed the file keep in your office. The data it contained consisted of the information we reconstructed and is shown in the development plan.

A document presenting the facts written by Mr. Suscavage was also reviewed, Dr. Drehman should cosign it, until that signature appears under Suscavage's no comment is given and the information should stay in your office.

Solid State responded by objecting to revocation, Alexander's represented Solid State Scientific Corporation position in defense of their commercial license. The revocation notice was changed to suspension until our license converts to a nonexclusive. Also we were notified all five of Solid States employees work for Alexander. There is an appearance that Alexander's group and Solid State are acting towards one common goal.

The determination as well as most matters will be reviewed by Alexander, including our option to extend the license period I contacted Sam Rosengraten, AFRL technology transfer officer and like you and me, he had no knowledge of this company's involvement, patent claims or licenses. This new information, along with similar technology and the numerous unexplainable hurtles in this long and drawn out possess presents a potential conflict that could become ratter significant.

It could appear that a company working along side us remained undisclosed until Feb 2000 with commercial intent and similar interests I presently wish to reserve further comments on this matter until a later date. We still have heard nothing about the second patent. This is also a concern since one of the patents has issued this second patent will not issue until after our first annual license request.

Issues are surfacing requesting actual data on the issued patent. Since the presented paper reports oxygen in the material, a target being a component made from this process would also have oxygen and would create poor films.

I feel one of our next major obstetrical will be dealing with the second patent, which still has not received its first office action and its allowance will not issue before our option to exercising the license for another year, if we elect to do so.

Since Dr. Alexander's has been making the decisions of what and when to accept something and after learning of Solid State interests to commercialize the same technology it appears a conflict is eminent. In addition, if we consider Solid State Corp commercialization intent and as a competitor, it is in their interest to establish proprietary process, file blocking patents or prolongs the issuance date.

I am requesting this letter be placed in the file for future reference if the need arises

Thank you

Kenneth Preston

Kenneth Preston
PDR, Inc.