*Philip F. Filosa*

ATTORNEY AT LAW
17 KENDRICK STREET
P.O. BOX 808
WRENTHAM, MASSACHUSETTS 02093
TELEPHONE: (508)384-3264
FAX: (508)384-3210

**FLORIDA** **RHODE ISLAND** **MASSACHUSETTS**
**UNITED STATES SUPREME COURT**

August 20, 2004

Clerk, U.S. Court of Federal Claims
717 Madison Place, NW, Room 103
Washington, DC 20005

RE: PDR, Inc. v. United States of America
#03-2047C

Dear Sir/Madam:

Emailed herewith for filing is the Amended Complaint of PDR, Inc. The only change is the addition of Count IV for Quantum Meruit.

Please note that there have been no changes to Exhibits A-J of the Original Complaint.

Sincerely,

s/Philip F. Filosa

cc. J. Williamson, Esq.

**UNITED STATES COURT OF FEDERAL CLAIMS**

==============================
PDR, INC.,
PLAINTIFF

V No. 03-2047C

UNITED STATES OF AMERICA,
DEFENDANT
==============================

**AMENDED COMPLAINT**

1. Plaintiff is a corporation duly organized under the laws of the Commonwealth of Massachusetts on or about October 1989.

2. The defendant is the government of the United States of America duly constituted per the Constitution of the United States of America.

3. Jurisdiction is in this case conferred on this Court by Title 28, United States Code, Section 1491.

4. On May 22, 1996, the plaintiff and the defendant entered into a Cooperative Research and Development Agreement (hereinafter the "CRDA"), and amendments and workplan thereto (see Exhibit "A" pages 1-24 Including amendments thereto and Workplan) defendant acting

through Robert McGahan, Director of Rome Laboratories, and Raymond P. Urtz, Deputy Director of Rome Laboratories, United States Air Force, dated May 22, 1996. The term of the CRDA was one year. The CRDA was first amended (hereinafter the "first amendment") on May 13, 1997, defendant acting through Horst R. Whittmann, Director of Rome Laboratories and Ted F. Bowlds, Commander of Rome Laboratories, United States Air Force (see Exhibit "A" pages 14-17). The CRDA was amended a second time (hereinafter the "second amendment") on September 24, 1999 (see Exhibit "A" pages 18-24). A CRADA is a creature of the Federal Technology Transfer Act.

5. The CRADA was one part of three (3) CRADA agreements entered into by the plaintiff with three government directorates. The directorates were USAF Rome Laboratory, USAF Eglin Armament Laboratory and DOE Idaho National Laboratory.

6. Under the terms of the CRDA the plaintiff agreed to use its intellectual property and financial resources to develop Nitride technology and targets with the initial Nitride being Gallium Nitride (see Exhibit "A"

page 10, sections 1 & 2) for the Air Force for its defense purposes, and the defendant agreed to provide laboratory facilities and certain materials for the research and development of Nitride technology and targets with the initial Nitride being Gallium Nitride. The defendant also agreed to provide space for the development of a plasma system to synthesize Gallium Nitride material for targets. The laboratory facilities were located at Hanscom Air Force Base, Bedford, Massachusetts (hereinafter "Hanscom"), and were a branch of Rome Laboratories, Rome, New York.

7. The CRDA further provided that the compensation to the plaintiff under the contract would be at plaintiff's option, exclusive or non-exclusive licenses to commercialize the developed technology to the benefit of the plaintiff (see Exhibit "A" page 3, paragraph 5.2).

8. The defendant assigned Mr. Michael Suscavage, an Air force employee and a full time PHD student at Tufts University, the task of working directly with the plaintiff to accomplish the goals of and objectives of the CRDA. The plaintiff was aware that Mr. Suscavage

was working on his PHD but was not aware, and was not informed by the defendant, that Mr. Suscavage was a full time PhD student. Assigning a full time PhD student as the primary technical interface between the plaintiff and the defendant directly and negatively impacted the prospective future compensation of the plaintiff under the CRDA with regard to an exclusive or non exclusive license to commercialize the technology. The negative impact on the plaintiff was that under 35 U.S.C. section 212 the defendant had no proprietary rights to any discoveries made at its facilities resulting from research carried out for educational purposes, which was the very type of research Mr. Suscavage was undertaking on the plaintiff's target utilizing additional proprietary information of the plaintiff provided to Mr. Suscavage by the defendant.

9. The CRDA required plaintiff and defendant to examine current fabrication and application methods "…to determine the most expedient route to target fabrication before funds are expended in areas that may have already been proven to be unsuccessful". (EXIBIT "A" page 10 section 2.0, and 3.1.1).

10. From May 1996 to May 1998 the plaintiff and defendant worked to construct a unique plasma system to synthesize the Gallium Nitride materials for the targets at plaintiff's sole expense while utilizing the laboratory defendant's facilities and personnel at Hanscom. Additionally Plaintiff provided funding to numerous subcontracted groups "all under proprietary agreements" to foster the unique intellectual concepts to be developed under the three CRDA's.

11. In April of 1997, at another location, Cerac Corporation in Wisconsin, which corporation was a subcontractor the plaintiff funded and engaged under the CRDA, plaintiff successfully synthesized (made) one Gallium Nitride target using ammonium salts as opposed to opposed to the plasma system plaintiff had been attempting to perfect at Hanscom over a period of approximately two years.

12. On May 15, 1997, plaintiff acting on advice of counsel, Philip Keonig, gave to Mr. Suscavage the proprietary Gallium Nitride target synthesized at

Cerac Corporation, developed per the CRDA for the defendant.

13. The target was given to Mr. Suscavage pursuant to the CRDA for analysis and characterization, i.e. to determine the quality of the Gallium Nitride target.

14. The first amendment to the CRDA is dated May 21, 1997 and primarily provided that the CRDA be extended an additional eighteen months.

15. From May 1997 to November 1997, Mr. Suscavage worked in isolation on the first known Gallium Nitride target ever made (in the world). Plaintiff repeatedly asked the defendant for performance data on the target during the investigation. Despite plaintiffs repeated requests no performance data regarding the targets changed hands between the plaintiff and the defendant during this critical period where the market potential of this discovery was immerging as a multi billion dollar industry.

16. During this period of time, Mr. Suscavage did provide plaintiff with target material purity data

which indicated the target met the requirements for performance evaluation.

17. From May 1997 until November of 1997 plaintiff was denied any information or data about the performance quality of its target, thereby making it impossible for the plaintiff to benefit commercially from its discovery.

18. In October of 1997 plaintiff developed a second target at Cerac Corporation with the intent of introducing it to the commercial market per the CRDA. To optimize the marketing potential of the second target, plaintiff again requested that the defendant release the research data on the first target. Upon the advice of counsel a patent application on the utilization of ammonia salts for the synthesis and solid state diffusion of gallium nitride was commenced. Per the CRDA the defendant was notified of the impending patent.

19. When the plaintiff notified the defendant of the existence of a second target, the defendant requested that the second target be given to Dr. Alvin Drehman

who, acting under the CRADA, would provide target sputtering performance data to the plaintiff. The defendant, aware of the existence of a second target, made a convincing case to the plaintiff that the work performed by Mr. Suscavage on the first target and that of Dr Drahmen on the second target would provide the basis for an impressive future presentation and the commercialization of the Gallium Nitride technology. The presentation would be made by the defendant representing plaintiff at the International Material Research Society Conference to be held on December 7, 1997. Based on the defendant's research and the implied cooperation per the CRADA, and acting on the advice of counsel who spoke to Mr. Suscavage, the plaintiff decided to make further investments into commercializing the gallium nitride technology and surrendered the second target to Dr. Drehman.

20. In December of 1997, Dr. Drehman, shared with the plaintiff data which was being withheld by Mr. Suscavage and not disclosed to the plaintiff by the defendant and which indicated the superior quality of the first target plaintiff had given the defendant.

21. On December 7, 1997, Dr. Drehman, representing the defendant presented the results of Mr. Suscavage's work on the first target to the Material Research Society in Boston, Massachusetts. The results which had been withheld from the plaintiff openly acknowledged the superior quality of the plaintiff's first target, and the ease and inexpensiveness of it's manufacture, and further acknowledged the fact that the plaintiff was the inventor of the manufacturing process for the making of the Gallium Nitride target, a process which until that time had been sought after unsuccessfully by the international community since 1987.

22. In December of 1997, plaintiff submitted to the U.S. Patent and Trademark Office an application for a patent for the process it had developed and funded for the synthesizing of the Gallium Nitride.

23. Immediately thereafter, plaintiff notified the defendant of it's application for the patent per the requirement of the CRADA (see Appendix "A", page 3, paragraph 5.3).

24. In late December of 1997, the plaintiff recognizing the magnitude of the commercial gallium nitride market and potential for a conflict of interest that could develop under the CRADA replaced Attorney Keonig with Attorney Jacob Erlic who is recognized as an 'expert' being the former chief of the intellectual legal office of defendants facility and author in the field of technology transfer. Attorney Erlic agreed to represent the plaintiff as an intermediary between the plaintiff and the defendant. Acting under the CRADA Attorney Erlic was to manage the activities between the plaintiff and the defendant, and seek funding opportunities and the commercialization of the gallium nitride technology.

25. On January 15, 1998, plaintiff provided marketing and technologically sensitive information to defendant through Mr. Suscavage, Dr. Drahmen, and Dr. Michael Alexander, Director of the Hanscom facility for Rome Laboratories for the drafting and submission of a grant proposal to the Ballistic Missile Defense Organization in Washington, D.C. to further develop and enhance the Gallium Nitride material (see Exhibit "B").

26. On January 16, 1998 Mr. Suscavage notified the plaintiff that his targets were inferior which was a direct contradiction to the data presented by Dr. Drehman at the MRS Conference three weeks earlier. Mr. Suscavage notified the plaintiff that he would withdraw from future work on the targets, and he isolated himself in his laboratory refusing to provide data on the results of his research. Dr Drahmen however, informed the plaintiff that despite Mr. Suscavage's claims he continued his work on the first target withholding important data that would have benefited the plaintiff in the commercialization of the gallium nitride technology. On the advice of Attornory Erlic plaintiff was not to confront Suscavge and counsel would resolve the issues.

27. In March of 1998 e-mails between Dr. Colin Wood, Program Manager Office of Naval Research Center, Arlington, VA, and Dr. Michael Alexander, Director of Rome Laboratories at Hanscom, openly acknowledged the success of the plaintiff in producing the much sought after gallium nitride target material with Dr. Alexander making it clear to Dr. Wood that the

discovery was proprietary to and would remain at Hanscom (see Exhibit "C").

28. Mr Suscavage returned the target to the plaintiff in May of 1998 without any usuable data. The target showed considerable wear and had a hole in the center which rendered it unusable. In effect, Mr Suscavage had investigated the target for nearly one year, offered to the plaintiff no relevant data, and returned the target in an unusable form which is in direct contradiction to the provisions of the CRDA. Again, the full time status of Mr. Suscavage as a PhD student working on the only gallium nitride target in existence created a situation that was in direct conflict with the intent of the CRDA and the expectations of the plaintiff to commercialize the technology. (Exhibit "A", page 12, section 4.2.1).

29. In May of 1998, defendant through Alvin Drahmen, notified the plaintiff that the defendant intended to file applications for patents for the synthesis of Gallium Nitride using the same technology as the plaintiff's.

30. Attorney Erlic representing the plaintive demanded per the CRDA, that plaintiff had the right to review the defendant's patent applications in order to determine any benefits it may render to the technology plaintiff had developed and delivered to the defendant, and to further determine if the plaintiff might to obtain a license for the technology per the CRDA.

31. In May of 1998, the defendant terminated the CRDA, locked the plaintiff out of its laboratory facilities, seized its Gallium Nitride targets, all research data and information plaintiff developed, and exchanged under the CRDA with the defendant, developed and exchanged under another CRDA with Idaho National Laboratory Plasma Physics Center, developed and exchanged under another CRDA with Eglin Air Force Base Armament Directorate, proprietary Gallium Nitride Laser Ablation proposal data from Stanford University, proprietary Brehman Furnace Design Data from Boston University, a plasma system made from quartz glass developed by plaintiff and Finkenbiner, Inc., and material processing methods developed by plaintiff and

Cerac, Inc., and informed the plaintiff that defendant considered all of the above seized property, and all information developed and exchanged as a gift to the Air Force (see Exhibit "D" letter from Stan Collier dated June 29, 1998 and response from plaintiff's counsel Jacob Erlic dated July 30, 1998).

32. In June of 1998, defendant entered into a CRDA with N Z Applied Technologies Corporation (hereinafter "N Z"). The subject matter of the CRDA was for the same purposes as the CRDA entered into with the plaintiff, i.e., the development and applications of Nitride technology.

33. Prior to June of 1998 N Z worked for the Air Force on a contract basis at Rome Laboratories performing Gallium Nitride research.

34. By entering into the CRDA with the defendant, N Z (now Corning) was given by the defendant access to the plaintiff's methods to develop the applications of Gallium Nitride and all research data and equipment developed under the CRADA with the plaintiff and seized by the defendant.

35. Within sixty days thereafter (after June 1998), N Z Applied Technologies Corporation was purchased by Corning for $275,000,000.00, and continued working for the defendant under the June 1998 CRDA.

36. Between October 1998 and January 1999, Idaho National Laboratory, Eglin Air Force Base, Stanford University and Boston University and Cerac, Inc. ceased all communications and cooperation with the plaintiff because of the defendant's seizure of their property.

37. On August 22, 1998 and October 2, 1998, plaintiff wrote to Major General Richard Paul, Commander of Air Force Research Laboratories pleading his case against the termination, the economic ruin and harm to its reputation the termination and seizure had wrought, and for the return of the seized property of the plaintiff and others (see Exhibit "E"). Plaintiff later also invoiced the Commander for $100,000.00 to cover the costs of moving plaintiff's proprietary technology to another laboratory.

38. On October 20, 1998, Major General Paul responded to plaintiff August 22, 1998 letter by instructing plaintiff to contact the Judge Advocate General's Office (whom he had apparently contacted) in an effort to resolve the situation (see Exhibit "F").

39. In April of 1999, defendant applied to the U.S Patent and Trademark Office for three patents and did not notify the plaintiff of the applications as per the CRDA.

40. All of the patents pertained to the synthesizing of Gallium Nitride targets using the same process and technology as that discovered by the plaintiff.

41. The inventors on the patents were listed as Michael Suscavage and Michael Alexander who were Air Force employees; and John Bailey, Michael Callaghan, and Meckie Harris, and David Bliss (whom plaintiff subsequently learned were employees of a private corporation working in the Hanscom Laboratory on a contract basis for the defendant).

42. In December of 1999, the plaintiff discovered that the defendant was preparing to present a paper at the 1999 Material Research Society in Boston. The paper was to present information about the defendant's successful technological developments concerning plaintiff's Gallium Nitride targets, and was written by Alvin Drehman of Rome Laboratories who had worked with the plaintiff to develop the very same technology prior to the seizure of the plaintiff's property.

43. Plaintiff reported in writing the existence of the paper and the inappropriate violation of its intellectual property to the Judge Advocate Generals Office at Hanscom Air Force Base. The paper was never presented.

44. After numerous contacts between plaintiff and the Judge Advocate General's Office a letter of intent was signed on March 4, 1999. The purpose of the letter of intent was to lay the foundation for a second amendment to the CRDA between the parties. The letter of intent provided that in lieu of financial compensation from the defendant, the plaintiff would be compensated in the following manner: (1)Plaintiff

would receive an exclusive license to the defendant's Gallium Nitride patents when issued; (2) Plaintiff would receive samples of defendant's claimed Gallium Nitride material for independent evaluation; (3) Plaintiff would receive an advance copy of a paper to be published by defendant (to give plaintiff advance commercialization opportunities); (4) Plaintiff's property and data would be returned. The purpose of the compensation was to make the Plaintiff whole and to enable it to commercialize the research results.

45. It took the defendant six months until September 1999 to draft a four page second amendment to the CRDA and sign it (see Appendix "A", pages 18-24). The second amendment was in conformity with the letter of intent.

46. In response to the CRDA and the second amendment the defendant gave the plaintiff six nanoparticles (barely, if at all visible to the naked eye and unsuitable for evaluation) of Gallium Nitride and informed plaintiff that the paper would not be published. Plaintiff and the Judge Advocate General's

Office worked for one year on a development plan for the license for the pending patents.

47. In February 2000 plaintiff discovered a published paper by the defendant which presented the Gallium Nitride technology, showed significant results and a handful of Gallium Nitride (as opposed to six nanoparticles).

48. In May 5, 2000 Julian L. Siegal, Chief, Intellectual Property Division, Office of the Staff Judge Advocate, Hanscom Air Force Base, Bedford, Massachusetts and the plaintiff approved the development plan and plaintiff signed the license. The package was given to Mr. Siegal's deputy for delivery to Air Force Headquarters for signature and final approval (see Exhibit "G" License).

49. On May 6, 2000, Mr. Siegal's deputy informed plaintiff that the development plan had been lost and that Air Force Headquarters had instructed that the license be signed by the local lab director at Hanscom and that there were other inventors on the patents to be licensed.

50. On May 17, 2000 after repeated attempts, plaintiff was finally allowed to meet with Julian Siegal and his new deputy at Hanscom.

51. At the May 17, 2000 meeting it was revealed to plaintiff that in the laboratory in which it had worked at its own expense for four years under the CRDA in addition to two years with the Judge Advocate General's Office in an effort to commercialize the results of its efforts, there were eight employees of a corporation, Solid State Scientific Corporation (hereinafter "SSSC") working full time.

52. These eight employees of SSSC had worked side by side with the defendant for over five years on defendants Gallium Nitride research utilizing the seized property and technology of the plaintiff. This occurred in spite of the fact that SSSC was working outside the parameters of its consulting agreement with the defendant which had nothing to do with the research which was the subject matter of the CRDA between the plaintiff and the defendant. The presence of SSSC in the laboratory at Hanscom and its access to

the proprietary information developed under the CRDA without the knowledge or consent of the plaintiff was a direct breach of the defendant's contractual confidentiality obligations there under (see Appendix "A", page 4, section 7.2).

53. These employees of SSSC were presented to the U.S. Patent and Trademark Office as co-inventors with the defendant on the patents filed by the defendant and had been promised nonexclusive licenses to the patents in direct conflict with the exclusive licenses promised to the plaintiff under the second amendment to the CRDA (see Appendix "A", page 19, Section 5.2.2).

54. In spite of the above, plaintiff approached investors in an effort to commercialize the technology in fulfillment of the development plan and the license agreement.

55. Defendant in direct conflict with the development plan and the license agreement, directly interfered with and destroyed the relationship between the plaintiff and its investors by slandering the

plaintiffs reputation and the technology of his patent in the business community, and refusing to release to the plaintiff the data, equipment and technology enhancements it seized in May of 1998 per the CRDA, its amendments and the license.

56. More particularly, among others: (A) the defendant interfered with negotiations between the plaintiff and Dow Investment, destroying the relationship between the two and later licensed the subject technology developed by the plaintiff to Dow Investments for $35,000,000.00; (B) rendered useless the investment of the U.S. Army Picitiny Arsenal, Picitiny, New Jersey, in the amount of $425,000.00 in a building and equipment, and that of the Odum Trust, Arcadia, CA which had agreed to contribute $250,000.00 and did in fact contribute $100,000.00.

57. On November 5, 2000, plaintiff submitted a detailed written explanation of the events of the past six years to the Secretary of the Air Force and requested an investigation of matter (see Exhibit "H"). This was lost by the defendant on three successive occasions, compelling the plaintiff to

submit it on four separate occasions over a three month period. The submission was made at the suggestion of Julian Siegel, Chief Intellectual Property Officer, Officer of the Staff Judge Advocate, at Hanscom.

58. The Secretary of the Air Force never responded to the plaintiff's request for an investigation.

59. Plaintiff then sent a similar letter to the Inspector General for the Department of Defense on January 18, 2001 again requesting an investigation. Plaintiff's first letter to the Inspector General was again lost, necessitating that a second be sent (see Exhibit "I").

60. The Inspector General for the Department of Defense opened a case for investigation #79613 and concluded its investigation in September of 2001 and instructed plaintiff to obtain its report through the Freedom of Information Act. It took plaintiff four months to obtain the report which consisted of seven pages of noted telephone conversation and found nothing amiss.

61. Plaintiff protested the results of the investigation and was told by the Inspector General of Defense's office to contact the Inspector General of the Air Force.

62. Plaintiff was then contacted by phone by the Inspector General of the Air Force's Office who left a message. Plaintiff later returned the call.

63. Plaintiff and the Inspector General of the Air Force's Office reviewed the matter over the telephone.

64. Within days of this telephone call, plaintiff was again telephoned by the Inspector General of the Air Force's Office and told to submit an invoice for labor and materials to their office.

65. Plaintiff submitted and invoice for $2,765,000.00 for labor, and material to their office.

66. To this date no response to the invoice by certified or registered mail has been received.

67. Under the CRADA plaintiff successfully developed the only commercially viable technology for the synthesis (production) of gallium nitride in the world. To date, after five years of work and cash expenditures of $395,000.00 during which plaintiff successfully developed and presented the defendant with the technology defendant sought under the CRDA, plaintiff has received no compensation whatsoever, either for remuneration of its expenses, 5 years of successful work under the CRDA, or commercialization of the technology it developed, and has suffered enormous financial harm.

**COUNT I**

**BREACH OF CONTRACT**

68. Paragraphs 1-67 are restated and incorporated herein.

69. Defendant, in refusing to disclose the results of its analysis and characterization of the plaintiff's targets breached the terms of the CRDA.

70. Defendant in failing to grant the plaintiff an exclusive license to the technology developed breached the terms of the CRDA and amendments thereto.

71. Defendant in locking the plaintiff out of the laboratory and research facilities at Hanscom Air Force Research Laboratory in Bedford, Massachusetts, breached the CRDA.

72. Defendant in filing its own patents without the defendant as co-inventor thereon breached the CRDA.

73. Defendant in disclosing the proprietary intellectual property of the plaintiff to other commercial interests in a non-confidential manner breached the CRDA.

74. Defendant in interfering with the commercialization efforts of the plaintiff breached the CRDA.

75. Defendant in interfering with the plaintiff's relationships with it's subcontractors by seizing their equipment and technology breached the CRDA.

76. All of the above as stated in paragraphs 63-75 caused great economic harm to the plaintiff.

**COUNT II**

**VIOLATION OF PLAINTIFF FIFTH AMENDMENT RIGHTS**

77. Paragraphs 1-76 are restated and incorporated herein.

78. In locking the plaintiff out of the Hanscom Air Force Base laboratory, seizing its equipment and its intellectual property, and failing to abide by the terms of the CRDA, defendant failed to provide any compensation to the defendant in violation of it's fifth amendment rights under the United States Constitution and caused the plaintiff great economic harm.

**COUNT III**

**BREACH OF CONTRACT**

79. Paragraphs 1-78 are restated and incorporated herein.

80. Defendants willful and wrongful withholding of the target data interfered with the execution of the development plan under the second amendment to the CRDA, frustrated the plaintiff's commercialization efforts under the license and breached the license agreement thereby causing it great economic harm.

**IV**
**QUANTUM MERUIT**

81. Paragraphs 1-80 are restated and incorporated herein.

82. The purpose of the CRADA was the development of a commercially viable (cost effective, inexpensive) process for the manufacture of gallium nitride in target form which at the time was unavailable worldwide.

83. Plaintiff successfully developed a commercially viable (cost effective, inexpensive) process for the manufacture of gallium nitride in target form and delivered two of them to the Defendant.

84. Defendant appropriated the Plaintiff's technology and mirrored Plaintiff's patent with patents of its own for the same process of producing the sought after targets, i.e., with the use of ammonium salts.

**WHEREFORE** plaintiff demands the judgment and the following award as damages:

1. Count I for breach of contract:
   $312,000,000.00;
2. Count II for violation of plaintiff's fifth amendment rights:
   $312,000,000.00;
3. Count III for breach of the license agreement:
   $312,000,000.00
4. Count IV in Quantum Meruit in the amount of
   $312,000,000.00.

together with interest, costs, and reasonable attorney's fees and for such other and further relief as the Court deems meet and just.

PDR, Inc.
By its Attorney

s/Philip F. Filosa
Philip F. Filosa, Esq.
17 Kendrick Street
P.O. Box 808
Wrentham, MA 02093
B.B.O. #165000
P.508-384-3264
F.508-384-3210

Dated: August 20, 2004