way AFRL was always promising but never did. His involvement led to contacts with university and government research centers prominent in GaN research. A total of three joint research and development proposals with third party institutions (Boston University, Stanford University and Idaho National labs) were written. Again all the proprietary information was made available to the AFRL as we always identified ourselves as working jointly with the AFRL.

In response Dr. Alexander's (Chief, EM Materials Branch, Electromagnetic Division, Sensors Directorate, Air Force Research Laboratory) email of 12 March 1998 to Colin E. C. Wood of the Office of Naval Research, with a copy to Mr. Preston states:

...Our CRADA work with Ken Preston's company is designed to determine how useful his GaN pucks are for PLD and sputtering and – equally important to provide an environment in which, without damaging the reputation of his product, he has opportunities to correct shortcomings we may discover...

In a further email of 12 March 1998 from Dr. Alexander to Mr. Preston, Dr. Alexander states:

...Obviously, we would like the first opportunity to work with your targets, be the first people to publish reports of high quality GaN deposited by sputter an PLD techniques, and get legitimate credit for helping bring GaN target technology to fruition. However, the targets are yours, not ours. Although we've shared our thoughts about using the CRADA and our lab as a test bed for your target, prior to widespread distribution, you ultimately are the only person who can make business decisions in what you consider the best interests of your company...

It is quite apparent from the above that no questions existed with respect to PDR's GaN targets and their relationship to the CRADA.

In April 1998, Drehman presented very promising results on of-axis deposition of GaN thin films using the PDR target at the Air Force Headquarters. These results were an integral part of our STTR proposal with Stanford University.

In April 1998, Mr. Suscavage returned one of our targets. This target had a hole in it and clearly indicates that Mr. Suscavage extensively used it past January 13, 1998. Mr. Drehman disclosed that at least 25 depositions were performed by AFRL with our targets. We never saw any results from this work.

On June 14, 1998, Mr. Stan Collier officially notified us that our CRADA is being suspended and that our targets were never under the scope of the CRADA agreement and is being considered as gifts to AFRL. I was denied access to the premises. All my property was seized, including the plasma system. The inability to utilize this plasma system led to suspension of other CRADA agreements, which relied on this system for crucial depositional work. The above mentioned STTR proposals never saw a light of the day despite their originality and involvement of very prominent researchers.

Now within the benefit of hindsight we believe AFRL made everything in their power to stop our commercialization effort and inflict harm.

A month later Dr. Drehman signed a new CRADA agreement with NZ Applied Technologies Inc. It is illegal to have two CRADA's with two different companies working in the same field by the same personnel. Or our CRADA unjustifiably was suspended to clear the way for unlawful transfer of our trade secrets and technology to another company?

Following many months of back and forth correspondence, I received the letter from Major General Richard R. Paul dated October 20, 1998, which stated his confidence in AFRL's intentions to resolve pending issues in good faith by the end of October 1998. Dr. Alexander responds and reiterates his initial position that targets were outside of the CRADA and that the suspension of the agreement stands.

I had no choice but to respond with an invoice to cover my expenses on targets and in addition demanded payment for targets usage by AFRL. Why AFRL, expected to have a valuable piece of property not covered by any agreement, as they insisted at the time, free? I also demanded the return of my second target and the plasma system, which were still in the possession of the lab.

In December 1998, I found an abstract by Dr. A. Drehman to be presented at MRS meeting in Boston that same month. Please note that it was submitted no later than July 1998, my target was used, and no acknowledgement of our involvement, and all the while AFRL was maintaining that targets are useless. Later AFRL choose not to proceed with the actual presentation.

In January 1999, Mr. Stan Collier called and suggested to put all the work under the extended old CRADA agreement. This decision was probably the result of some pressure from the Air Force Headquarters. Next many months saw continued delays and back and forth correspondence. On March 4, 1999, at the meeting with Dr. Alexander I was offered a license to a technology, which was not patented yet, as compensation. Dr. Alexander stated that he is not acknowledging my previous invoices and returned my second target.

In April 1999, patent applications (AFB 00437 & AFB 00473) were filed and stated that the results of laser ablation depositions using my targets were unsatisfactory. This statement was later amended on my insistence.

During the same month, both AFRL's legal team and I were stunned to learn that Solid State Scientific Corp. had a license to practice this invention. AFRL made a contractual commitment to revoke Solid State's License. On September 5, 2000, the exclusive license for the above-mentioned patents was signed. One of those patents No. 6,113,985 was issued on September 5, 2000, which triggered our exclusive licensing period. The other is still not issued and we do not know the reason for this delay.

The repeated attempts by the AFRL's legal department to revoke Solid State's license failed. Dr. Alexander complained that Solid State is subjected to undue pressure and stated that this company works for him defending their refusal to surrender the license. Solid State Scientific Corp. is an on site AFRL's service contractor. It is being paid to perform certain work on behalf of the AFRL. This company has an access to proprietary information of all other entities engaged in collaboration with AFRL. As such it has certain fiduciary duties to adhere to and should not be allowed to gain, the rights to work performed by others in collaboration with AFRL and then emerge as a potential competitor in the commercial marketplace. As far as we are concerned, it is a grave example of the conflict of interest, which AFRL is responsible for and has to correct immediately. Is Solid State a vehicle, a Trojan horse, used by Mr. Alexander and others involved, to misappropriate our and the US government's technology?

Since June 2000, I have joined forces with Mr. Chirvani Abdoullaev, who became an equal partner of the PDR, Inc. Mr. Abdoullaev concentrated his efforts on raising venture capital to finance commercialization effort of the technology in question. A number of venture capital firms were approached; a numerous presentations were conducted.

In October 2000, Mr. Abdoullaev called Mr. Drehman to discuss results of his work on sputtering depositions using my targets. Among other things, Mr. Drehman stated the following:

- The GaN targets were contaminated and deposition results were unsatisfactory.
- The AlN target depositions he is currently working on offer better results. He declined to elaborate on specifics stating his intention to file additional patents.
- Mr. Drehman also suggested that PDR's exclusive license wouldn't be renewed.
- He further advised against working with me implying I am not a trustworthy person to align anyone's business interests with.

These statements contradict Mr. Drayman's earlier results and information given to me and other people. The AlN target deposition was part of my CRADA agreement as evidenced from the presentation given by Mr. Drehman at the Air Force Headquarters. The last two comments clearly aimed at jeopardizing any commercialization effort on my part. Have any of the companies we have approached were scared of by such comments made by any of the AFRL's employees?

When I complained to the AFRL's legal team, without disclosing Mr. Drayman's name, they asked me if the person I was talking about was Mr. D. Bliss, as they were aware about Mr. Bliss's negative comments made about me elsewhere. I don't have to say what a negative comment of any sort would do when anyone is in a process of deciding to commit financial or other resources to our commercialization effort. Does it not implicitly understood, that any government agency involved in technology transfer has to assist the process with, among other things, promoting the technology to outsiders.

It is abundantly clear by now that issues presented are beyond any simple disagreements, which might have emerged from my CRADA agreements with AFRL. The issues are much more serious in nature and require thorough investigation. Violation of constitutional rights, conflict of interests, property theft, breach of contract, assassination of character, misrepresentation, illegal dealings, unfair competition, deliberate attempts to inflict harm and cover-up are within the scope of your organizations mandate. We ask for your involvement, as we are running out of options in trying to resolve these issues amicably and directly with AFRL. Our latest two requests to correct wrongdoing were ignored.

I was trying to give you a scope of the issues in a very compressed form. If you require any additional information or clarification, please do not hesitate to call me at 508-543-4052.

Thank you

Kenneth Preston

Kenneth Preston
PDR, Inc.

January 31, 2001

→ IG-Q

Attn.: Ruth Thornton
SAF/MI
1660 Air Force Pentagon
Washington D.C. 20330-1660

FEB 2001
RECEIVED

Re.: Request for an Investigation

Dear Ruth:

Thank you for your offer to track our correspondence to the Secretary of the Air Force.

Our letter dated November 8, 2000 (and then again dated December 11, 2000 after being lost) raised very serious issues, which directly undermine our ability to conduct business and place undue hardship on our personnel and their families. We have not received any indication that our correspondence was reviewed.

We are kindly asking for your assistance to help us make sure that our letter ends up on the desk of the person with decision-making authority. Sixty days normally required to respond to such requests are up on February 8, 2001. It would be unfortunate if this matter becomes public without due response from the Air Force authorities.

Thank you in advance for your invaluable assistance.

Yours truly,

Kenneth Preston

Kenneth Preston
PDR, Inc.
54 Adams Street
Foxboro, MA 02035
Ph: 508-543-4052

Office of the Secretary

DEPARTMENT OF THE AIR FORCE
OFFICE OF THE INSPECTOR GENERAL
WASHINGTON, DC

SAF/IGQ
1140 Air Force Pentagon
Washington DC 20330-1140

9 Feb 01

Mr Kenneth Preston
PDR, Inc.
54 Adams Street
Foxboro, MA 02035

Dear Mr. Preston,

This is in response to your 31 Jan 01 correspondence to the Office of the Secretary of the Air Force, Manpower, Reserve Affairs, Installations & Environment (SAF/MI).

We reviewed your concerns and asked the Air Force Material Command, Inspector General, Inquiries Directorate (HQ AFMC/IGQ) to ensure that your they are looked into by the appropriate agency. Someone from the Air Force Material Command, Inspector General office will contact you regarding your complaints.

We appreciate you concerns and thank you for bringing these matters to our attention.

ROY A RATHBUN, Lt Col, USAF
Chief, High Level Inquiries

THIS LETTER AND THE ATTACHED ARE PRIVILEGED DOCUMENTS. THEY WILL NOT BE RELEASED OR REPRODUCED IN WHOLE OR IN PART OUTSIDE THE AIR FORCE WITHOUT THE APPROVAL OF THE INSPECTOR GENERAL, USAF

UNITED STATES COURT OF FEDERAL CLAIMS

PDR, INC., Plaintiff, vs. UNITED STATES OF AMERICA, Defendant.

CIVIL DOCKET CASE NO: 1:03-CV-02047 GWM

COPY

DEPOSITION OF DAVID BROOKE HATFIELD, PH.D.

October 20, 2006

Tucson, Arizona

BY: FLORENCE PASTEUR, CR #50300

UNITED COURT REPORTERS, INC.
(520) 792-2600 or (800) 759-9075

CONFERENCE ROOMS:
Suite 200
177 North Church Avenue

MAILING ADDRESS:
P.O. Box 17507
Tucson, Arizona 85731

application that's not related. And I can understand why they might say that. But there's also something in that that's kind of odd, because they say the active component is the halide to produce the nitride, which somebody who is conversant with chemistry knows that halide doesn't produce the nitride.

And so it seems to me that if we're really concerned about designating inventorship and evaluating in a real apples-to-apples sense that we would spell that out a little more carefully. It just confuses me that it's one-sided.

Q Okay. Let me just step back a moment. What you're confused about, as I understand it, is that the patents that you refer to as B, C, D and E in your report --

A Yes.

Q -- that is, the '752, '540, '739 and '985 patents, that those do not give credit to Mr. Preston's work, is that right?

A Yes.

Q Okay. But putting that aside for the moment: That does not change your agreement that the Air Force had a comprehensive program in the growth of gallium nitride using ammonium salts prior to Mr. Preston's involvement?

A According to this report, apparently they had something in place.

Q And you had testified earlier that Mr. Preston's patent had two major components -- actually, I said one; you added the second one -- the first one being the use of ammonium salts, and the second one being hot pressing, is that right?

A Correct.

Q The Air Force was using the ammonium salts beforehand, as we agreed to on Page 25, correct?

A That's what the data in the report suggested, that they were.

Q And B, C, D and E do not use hot pressing, do they?

A I believe they do not.

Q Okay. So the first component of Mr. Preston's patent was actually already being used by the Air Force before Mr. Preston entered the scene. Yes?

A It would appear they attempted it.

Q Okay. And the second component was not used at all in B, C, D or E, was it?

A That would be correct.

Q Great. Okay. Now, a cleanup question. I was asking you about your background and whatnot. Have

**Raven Research**
P.O. Box 1306, Oracle, Az 85623

520-896-9568
hatfield@tahosa.us

Kenneth G. Preston
495 Placita Amuleto
Sahuaita, Az 85629

17 March 2006

EXHIBIT 2
D. Hatfield
10-20-06

Subject: Patent Review

| | | | |
|---|---|---|---|
| A | **5,942,148** | **24 Aug.1999** | **Preston** |
| B | 6,676,752 | 13 Jan. 2004 | Suscavage, et al. |
| C | 6,406,540 | 18 Jun. 2002 | Harris, et al. |
| D | 6,306,739 | 23 Oct 2001 | Alexander, et al. |
| E | 6,113,985 | 05 Sep. 2000 | Suscavage, et al. |

Dear Mr. Preston,

I have reviewed the patents listed above, as per your request, and am reporting my opinions. I have only reviewed the patents listed above and have not researched any of the supporting documents referenced in these patents.

Patent A (5,942,148) is clearly the earliest patent in this set to reference the use of ammonium salts ($NH_4X$) as an aid in preparing gallium nitride (GaN). This patent makes a generic claim that the ammonium salts produce nitrogen radicals which are responsible for the improved yield of GaN. This claim may not be accurate, because the presence of gas phase radicals is not necessary for the ammonium salts to behave in the manner described. Equation 1 describes the thermal dissociation process that patent A claims is responsible for the low yield of previous sintering processes.

**Equation 1** $$2\cdot GaN_{(s)} \xleftrightarrow{\Delta H} 2\cdot Ga_{(l)} + N_{2(g)}$$

This thermal dissociation reasonably predicts that the stable end products are neutral species; Gallium metal (Ga) and Nitrogen gas ($N_2$). There is an equilibrium that exists between the Gallium nitride (GaN) reactant and the products. The Gallium nitride will decompose when heated until the chemical potential of the reactant is equal to the chemical potential of the products.

Le Chatelier's principle is clearly responsible for the observed low yield of Gallium nitride when it is heated in an open system, where the nitrogen gas is free to escape. Increasing the chemical potential of nitrogen gas will tend to drive the reaction backwards: producing GaN from Ga an $N_2$. The chemical potential of a gas increases as the partial pressure of that gas increases.

Ammonia gas will also thermally decompose to produce ammonia gas and hydrogen gas. Equation 2 describes this chemical equilibrium.

**Raven Research**
P.O. Box 1306, Oracle, Az 85623
520-896-9568
hatfield@tahosa.us

**Equation 2** $$2 \cdot NH_{3(g)} \xleftrightarrow{\Delta H} N_{2(g)} + 3 \cdot H_{2(g)}$$

Ammonium salts ($NH_4X$) generally have a low vapor pressure and will sublime at even at room temperature; to produce detectable quantities of the compound. Ammonium salts also dissociate in the gas phase to produce ammonia gas and an acid form of the anion in the salt.

**Equation 3** $$NH_4X_{(s)} \longleftrightarrow NH_4X_{(g)}$$

**Equation 4** $$NH_4X_{(g)} \longleftrightarrow NH_{3(g)} + HX_{(g)}$$

The volatilization and dissociation of ammonium salts to produce ammonia gas, described by Equation 3 and Equation 4 will proceed to a much greater extent at elevated temperatures, such as those described in Patent A.

These concepts are considered common knowledge in modern chemistry. In fact, the Haber process for producing ammonia gas from hydrogen and nitrogen at elevated temperatures and pressures is commonly used to teach equilibrium and Le Chatelier's principle in introductory chemistry courses. The Haber process is essentially Equation 1 driven in the reverse direction by high pressures.

Patent A describes the use of ammonium carbonate ($(NH_4)_2CO_3$). The thermal decomposition of this compound will produce ammonia gas, nitrogen gas, hydrogen gas, water and carbon dioxide. Equation 5 describes this reaction, however the ratio of products obtained will depend on the conditions.

**Equation 5** $$(NH_4)_2CO_{3(g)} \longleftrightarrow NH_{3(g)} + N_{2(g)} + H_2O_{(g)} + H_{2(g)} + CO_{2(g)}$$

**Raven Research**
P.O. Box 1306, Oracle, Az 85623
520-896-9568
hatfield@tahosa.us

The casual reader of patent A, assuming the reader has a basic understanding of chemistry, would certainly understand that the important component of the ammonium salt used is the ammonium ion – and understand that the carbonate ion does not play a primary role, other than providing a neutral environment and aids in preventing oxidation of the gallium metal. Patents B, C, D, and E show that the nitride is stable, even in the presence of hydrogen choride gas, which is a powerful oxidizer. The efficacy of the ammonium cation may be altered by the choice of the anion used.

One can safely assume that anyone who has taken a college level introductory course in chemistry would understand the principles at work and comprehend the role the ammonium ion has and also comprehend the potential roles of the salt's anion in the process described in patent A.

Patents B, C. D and E all refer to a process of generating GaN from the Gallium Chloride. These patents all claim that Equation 3and Equation 4 are active when the ammonium salt used is an ammonium halide, for example X represents Cl, Br, or I. Patent B references work published in 1969 (Maruska & Teitjen) which appearantly describes the use of separate streams of Hydrogen chloride and ammonia gasses to produce GaN. The novelty of this patent (E) rests on the use of an ammonium halide salt to produce a single stream of hydrogen halide and ammonia gases.

All patents listed above appear to acknowledge that GaN spontaneously decomposes into Ga metal and Nitrogen gas at elevated temperatures. The claims in patent A demonstrate that the chloride intermediate claimed by patents B, C, D and E is not necessary for the conversion of Ga metal to GaN. In fact, the claims in patents B, C, D, and E make it clear that the gallium nitride is more stable than the gallium halides.

Gallium metal becomes a liquid at about 30 C and has a substantial vapor pressure at the processing temperatures claimed by all patents.

The intermediate chloride, $GaCl_{3(g)}$, claimed by patents B, C, D, and E may not be required for the processes claimed by these patents to operate. These patents claim that the Gallium chloride (Mp = 79C) is produced, then transported to another zone where it is converted to the more stable gallium nitride. It is possible that the metallic gallium would behave in a similar way, due to its vapor pressure.

I suspect, that the processes claimed by patents B, C, D and E would operate if another ammonium salt, such as the carbonate, were used. Such and experiment would confirm or refute the claims that gallium halide is an active agent in the process.

***Raven Research***
P.O. Box 1306, Oracle, Az 85623

520-896-9568
hatfield@tahosa.us

In summary, I have reviewed the patents you provided and find:

- The description of ammonium salts in patent A would be sufficient cause for anyone with a cursory understanding of chemistry to believe that any ammonium salt would work.
- That the use of ammonium carbonate, as described in patent A, is sufficient evidence to believe that a gallium halide intermediate is not required for the production of GaN from Ga metal and nitrogen gas.
- The processes described by and claims made by patents B, C, D and E flow logically from work published in 1969 and patent A.
- As you have informed me that the author of Patent E participated in the characterization of the method described in patent A, one can easily see the connection between the use of ammonium halides in patent E and the use of ammonium carbonate in patent A.

Please let me know if I may be of further assistance,

Regards,

D. Brooke Hatfield, Ph.D.
Chemist,
Raven Research

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PDR, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03-2047C |
| v. | ) | |
| | ) | (Judge George Miller) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DECLARATION BY IAN T. FERGUSON, PhD

I, Ian Ferguson, make the following declaration in accordance with 28 U.S.C. § 1746. I am aware that this declaration will be used in the United States Court of Federal Claims, and that this declaration is the legal equivalent to a statement under oath.

1. I am a Professor in the School of Electrical and Computer Engineering at the Georgia Institute of Technology ("Georgia Tech") and have been employed as an expert witness in this case by the Department of Justice.

2. I wrote the 41-page expert report (as redacted) that follows this declaration. At the time I wrote the report in 2005, I believed everything within it to be true and accurate. I still believe the report to be true and accurate, although it is possible that, since the subject of my report is an area of ongoing scientific research, a few peripheral matters may have changed, but I have not re-reviewed my entire report to determine if that is so. I have reviewed everything in section 5 of the report and that section remains true and accurate at this date.

I have read the foregoing one-page declaration and I certify under penalty of perjury that it is true and correct.

s/ Ian T. Ferguson
Ian T. Ferguson, PhD
Professor, School of Electrical and
Computer Engineering
Georgia Institute of Technology

March 9, 2007

## 1. Introduction

This Expert Report is being provided to address issues of technology raised in the complaint filed in PDR, Inc. v. United States, Fed. Cl. No. 03-2047C (Judge George W. Miller). My name[1] was included on a short list of potential experts in the semiconductor field provided by the Air Force to their legal counsel. I began discussions with Mr. Williamson from the U.S. Department of Justice to assess my suitability and availability for the task in January 2005. I signed a contract in early February 2005 to provide an expert opinion on this case.

The relationship between PDR and the United States Air Force was originally initiated around a Cooperative R&D Agreement ("CRDA"), 22 May 1996, to produce gallium nitride ("GaN") targets for the solid vapor deposition of GaN. The technique chosen to produce the targets was an Inductively Coupled Plasma Spray Process as the equipment to complete the work was already in place at the Air Force[2] (Rome Laboratory, Hanscom AFB or Air Force Research Laboratories). PDR had to provide the staff and know how for the purposes of the CRDA. Approximately one year into the CRDA, 15 May 1997, Mr. Preston[3] (owner and sole employee of PDR) presented the Air Force a GaN target that was produced elsewhere. The Air Force completed Pulse Laser Deposition (PLD) with the target but concluded that it was not usable due to the generation of particulates. Mr. Preston was also told that because the target was not manufactured (jointly) by a Plasma Spray Process, it was outside the scope of the CRDA.

I was asked by Mr. Williamson to provide the U.S. Department of Justice an Expert Opinion regarding aspects of the complaint as detailed below:

Introduction: Expert Credentials
1. What, if anything, did Mr. Preston invent regarding GaN films?
2. What did the Air Force invent regarding GaN films?
3. Were any of the 3 patents ('148, '540, and '985) commercially valuable?
4. What type of GaN research were NZ Applied Technologies and SSSC pursuing?
5. Why did Corning buy NZ Applied Technologies?

The scope of the report was increased to add some comments about the function of the work plan in a CRDA, 'Comments on the purpose of a work plan in a CRDA', since I had some expertise in that area. I later added another section titled 'Understanding Semiconductor Materials and GaN' when drafting the report to provide the necessary background to help the reader better understand its technical content. It should be noted that due to my broad expertise in both research and technology transfer in business that some aspects of this report are not purely technical.

This report will show that the primary inventive contribution that Mr. Preston made to GaN technology was the addition of an ammonium salt to GaN powder when hot pressing targets. The original CRDA and its 1st amendment between the Air Force and PDR made no mention of either the fabrication or use of targets by the process of hot pressing. The documented evidence clearly shows that the Air Force had a comprehensive program of the growth of GaN-based using ammonium salts prior to its involvement with Mr. Preston. Mr. Preston could not provide proof of invention for his patent (U.S. Patent No. 5,942,148) that issued in 24 August 1999. The first written reduction was by Dr. Kong[4] from Idaho National Electrical and Environmental

---

[1] Professor Ferguson: See http://www.ece.gatech.edu/faculty/fac_profiles/bio.php?id=34
[2] The Air Force laboratory has had a series of names during the time period of the complaint, www.afrl.af.mil.
[3] Appendix E: Preston Resume
[4] Appendix E: Kong Resume

Laboratory[5] ("INEL") although his possible inventive contribution does not appear to have been recognized. It will also be shown that the addition of ammonium salt such as ammonium carbonate $(NH_4)_2CO_3$ to the GaN powder results in the incorporation of carbon and oxygen that renders it useless for semiconductor applications. The PLD data produced by the Air Force from the targets was inferior to that already reported in the literature. A comparison of the technology patented by Mr. Preston and that of the Air Force shows the starting materials, the process and the end product are all different. A reasonable attempt by Mr. Preston and his business partner to commercialize the technology were unsuccessful suggesting it had little commercial value. An overview of this report is summarized as a presentation in Appendix A.

## 2. Academic and Industry Biography (Dr. Ferguson)

This section contains a summary of my academic and industry biography along with some detail of publications and information relevant to this opinion. A complete academic resume is attached in Appendix B.

In summary, I have been an active researcher in compound semiconductor materials for 20 years (since 1985), publishing on analysis of x-ray data from GaN-based materials for 10 years (since 1995). In the last 9 years (since 1996), I have raised over $16 million in government funds for research while in both academia and industry. In particular, I have extensive experience with the Small Business Innovative Research ("SBIR") program. While in industry I managed and negotiated a number of CRDA agreement with Sandia National Laboratories, and others, for both in-kind (CRADA SC093/01186, ~$5-6 million) and funds-in (CRADA SC099/01570, ~$2 million) programs. While at EMCORE I worked with outside counsel including Lerner, David, Littenberg, Krumholz & Mentlik (ldlkm.com) and White and Case (whitecase.com) to develop both an offensive (approx. 80 internal invention disclosures) and defensive intellectual property strategy to protect its work on GaN-based materials.

Academic Background

I am a Professor in the School of Electrical and Computer Engineering[6] at Georgia Institute of Technology (Georgia Tech). Since arriving at Georgia Tech I have been made the Coordinator for the Focused Research Center Next Generation Lighting[7] and a Professor in the School of Materials Science and Engineering[8]. My research focuses on the area of wide bandgap materials and devices (emitters, detectors and electronics) using GaN and zinc oxide ("ZnO")-based materials and developing these materials for illumination and spintronic applications.

Prior to joining Georgia Tech, I was the *Director of Research Development* at EMCORE Corporation and held a range of positions with the company including Director of Intellectual Property and General Manager of In-situ Products. I have also worked with interdisciplinary research groups at Northwestern University in Evanston, Illinois and at the Imperial College in London, England. I have has a particular interest in research that involves an interdisciplinary approach that is often conducted in collaboration with industry partners. I also have been actively involved in the entrepreneurial process of establishing new companies.

---

5 www.inel.gov
6 www.ece.gatech.edu/faculty/fac_profiles/bio.php?id=34
7 www.ssl.gatech.edu/
8 www.mse.gatech.edu/people/faculty/ferguson/ferguson.html

I have over 130 refereed publications, authored four book chapters, two books (one currently being edited), and holds four patents. I have given over 100 invited and contributed talks throughout the US, Europe and Asia. I also founded and co-organized the 'International Conference on Solid State Lighting[9]', the major technical conference in this area of technology. I am also a member of numerous professional societies.

Business Experience

I have worked extensively in industry during my career and I am currently on the technical advisory board of a number of companies. I was most recently based at EMCORE Corporation as the *Director of Research Development* providing strategic and tactical focus for EMCORE's longer range research and development defining the technical roadmaps for future product development. I received a National Small Business Association Award at the White House in Washington DC in 1997. for contributions to the SBIR program that resulted in over $200 million of commercial product and the formation of a joint venture. I also operated as the *General Manager, In-situ Products* for a business unit operated as a separate profit and loss center within EMCORE. I transitioned various technologies from the laboratory into the marketplace leveraging about $50 million of sales. As the *Director, Intellectual Property* I defined EMCORE's strategic approach and budget for intellectual property issues, coordinating this activity. I addressed technical and business issues associated with due diligence in various areas including joint ventures.

I am currently on the technical advisory board of a number of companies. I have been involved in assisting these companies in raising both equity and debt. I also started two companies since arriving at Georgia Tech and have raised funds through the SBIR program for one of them.

Education

- Ph.D. Semiconductor Physics: University of St. Andrews, Scotland (June 1989)
- M.Sc. Optoelectronics: University of St. Andrews, Scotland (June 1986)
- B.Sc. Physics (Honors): Heriot Watt University, Scotland (June 1984)

Selected publications relevant to this opinion

*Book (Appendix C):*
III-V Nitride Semiconductors: Growth and Substrate Issues
O. Manasreh and I. T. Ferguson
Published by Taylor and Francis, 669 Pages, November 2002

*Book Chapter (Appendix C):*
Semiconductor Homo- and Hetero- Device Structures Epitaxial Film Growth and Characterization
I. T. Ferguson, A. G. Thompson. S. A. Barnett, F. H. Long and Z. C. Feng
In the Handbook of Thin Film Devices: Frontiers of Research, Technology, and Applications
Published by Academic Series, June 2001, pp1-54

[9] www.spie.org/Conferences/Programs/05/am/conferences/index.cfm?fuseaction=5941

*Edited conference proceedings:*
Proceedings of SPIE[10] Volume **3621** (1999)**,** Volume **3938** (2000)**,** Volume **4445** (2001)**,** Volume **4776** (2002), Volume **5187** (2003) and Volume **5530** (2004)

*Selected publications on the x-ray analysis of GaN-based materials (Appendix D):*
High Quality AlN and GaN Epilayers Grown on (0001) Sapphire, (100) and (111) Silicon Substrates
P. Kung, A. Saxler, X. Zhang, I. T. Ferguson and M. Razeghi
Applied Physics Letters **66** (1995) pp. 2958-2961

XRD and optical Characterization of GaN and Associated Substrate Materials
E. B. Fantner, T. Ryan, M. Schurman and I. Ferguson
Materials Science Forum **321-3** (2000) pp. 1056-1060

Effects of Indium Incorporation in AlGaN on Threading Dislocation Density
H. Kang, S. Kandoor, S. Gupta, I. Ferguson, S. P. Guo, and M. Pophristic
Phys. stat. sol. (c) **2** (2005) pp.2145–2148

*Patents:*
Apparatus for performing wavelength-conversion using phosphors with light emitting diodes
R. F. Karlicek, I. T. Ferguson, D. Garbuzov and J. C. Connolly
US 6,366,018 (Issued April 2, 2002)

Method and apparatus for performing wavelength-conversion using phosphors with light emitting diodes
R. F. Karlicek, I. T. Ferguson, D. Garbuzov and J. C. Connolly
US 6,404,125 (Issued June 11, 2002)

*Expert witness: (JAM STRAIT, INC. VS AMERICAN PRODUCTS COMPANY, INC.)*
Case No.:02-2036 United States District Court, Eastern District of Louisiana.

Professional Contributions

*Conference Organizer and/or Chairman:*
NATO Advanced Research Workshop, UK MBE Consortium, Illinois Chapter of the American Vacuum Society, The International Society for Optical Engineering (SPIE), Materials Research Society (MRS), Workshop on Compound Semiconductor Materials and Devices (WOCESMADD), Workshop on Energy Efficient Advanced Lighting[11] and the AFOSR Workshop on Wide Bandgap Ferromagnetic Semiconductors[12].

*Proposal and Journal Reviewer:*
- A reviewer for NSF and DOE for academic and SBIR (Phase I and II) proposals.

[10] www.spie.org
[11] www.ssl.gatech.edu
[12] www.ece.gatech.edu/conferences/AFOSR

- A reviewer for Journal of Vacuum Science and Technology, Applied Physics Letters, Journal of Applied Physics, Journal of Crystal Growth and the IEEE Journal of Quantum Electronics.

Grants and Contracts

*Industry:*

While at EMCORE Corporation obtained $4.9M in funding through the SBIR program (Phase I and II) and $7.6M in direct funding (i.e. non-SBIR) from government agencies including the Air Force, Office of Naval Research, Defense Advanced Research Project, National Aeronautics and Space Administration and Ballistic Missile Defense Agency.

*Georgia Tech (since August 2001):*

Obtained $4.2M in funding from some of the government agencies listed above and in addition the National Science Foundation, Air Force Office of Scientific Research, Department of Energy Army Research Office and various companies (both SBIR and direct).

## 3. Understanding Semiconductor Materials and GaN

During the past decade GaN-based Light Emitting Diodes (LEDs) have been widely used for various applications such as traffic signals, backlights for mobile phones, and displays as well as other signage. Commercialization of InGaN blue and green LEDs and the fabrication of III-Nitride laser diodes have demonstrated the enormous potential of III-nitride materials resulting in total sales in 2003 of greater than $3 billon, (Section 6). More recently, high brightness blue and UV emitters have obtained more attention due to the promise of applications in solid state lighting. Owing to their long lifetime, small size, environmentally friendly character and low energy consumption, LEDs could potentially replace the incandescent bulb or even fluorescent lamps with a potential market in the tens of billions of dollars worldwide. As a consequence the primary commercial focus of GaN-based technology has been optical emitters. Other less commercial uses for GaN are being investigated by the Air Force, and other Department of Defense (DOD) laboratories, for applications such radar systems and RF communication base stations.

GaN can be compared to other semiconductors materials such as silicon, used in computers, and gallium arsenide (GaAs) or indium phosphide (InP), used in communication systems. These semiconductor technologies are clearly differentiated from GaN by its ability to produce light in the blue/green region and its potential to produce transistors that can switch much higher currents. The full potential for GaN-based devices and their potential commercial markets was not completed understood at the time that Mr. Preston and the Air Force first began their discussions. It was most likely that both Mr. Preston and the Air Force saw this as new area of government funding that could potentially support their commercial and research interests.

### 3.1. Understanding Semiconductor Materials: Epitaxial growth[13]

The electrical properties of materials (i.e. the flow of electrons through them) can be characterized by their ability to conduct electricity. A conductor such as copper can easily conduct electricity, an insulator such as plastic does not conduct, and a semiconductor such as silicon has electrical properties that fall between that of conductor and an insulator. It has been

[13] Appendix A: Slide 4