Disclosure and Record of Invention

1. Descriptive title of the invention
2. Identification of inventor(s)
3. Summary of the invention
4. Use(s) of Invention
5. Date invention was conceived/disclosed to others/and to whom:
6. Date of first drawing or sketch/written description/model:
7. Has the invention been tested?
8. Has the invention been used?
9. Names and addresses of persons having personal knowledge of any of the facts in items 5-8
10. Has the invention been or will it be disclosed in any printed publication?
11. List any prior publications, patent applications, products or uses which are closely related to the invention.
12. Description and operation
13. If this is a joint invention describe the contribution made by each of the joint inventors.
14. Certification of invention

The form is designed to ensure that an invention has been made and can be reduced to practice, and that the inventive contribution of all the researchers is recognized. This is important to ensure the validity of the patent, and so that all inventors, including Air Force employees and inventors can make the correct assignment for the invention. The documentation also ensures that a patent is not compromised by disclosure due to the researchers publishing the data before a filing was made.

The Invention Evaluation (AF Form 1981) is then used for an independent assessment of the invention before the cost of a patent application is incurred. The form contains the following sections:

Invention Evaluation

1. Is the description of the invention complete enough to permit a meaningful evaluation?
2. Title of the Invention:
3. Inventor Name(s):
4. If made under contract, Contractor Name and Contract Number:
5. Describe the invention in relation to the state of the art.
6. Present status of the invention:
7. Has the Air Force expended funds to research or develop the invention?
8. Best estimate the future Air Force funds to be spent on research and/or development of the invention:
9. Best estimate of the quantity of items incorporating the invention the Air Force will make or procure.
10. Describe any potential commercial uses for the invention and the companies or groups most likely to be interested in the invention.
11. Has the invention been described in any publication?
12. List any known patents or publications which discloses a device, process or composition of matter similar to or identical with the invention:
13. Remarks:
14. Security Classification of the Invention:
15. Recommendation:

The primary function of the invention evaluation is to make an independent assessment of the invention and the resulting technology. This form also focuses on the commercial value of the patent, because many researchers mistake a patent application for a technical publication rather than a document of commercial value that contains commercial information. The technical assessment of the AF Form 1981 for the inventions that issued as the ‘540, ‘985, and ‘765 patents were completed by someone familiar with the art and approved by the Laboratory Branch Chief.

The Air Force had a particular strategy for filing of three patents associated with it ammonium halide (salt) research[99]. This included –

- Filing a series of patent applications together on the same date to minimize invaliding one of the inventions because it may be taught by another.
- To develop a defensive position relative to the patent applications filed by others in this area of technology.
- To separate out new process technology from modifications of existing technology.

There is no evidence that any PCT (Patent Cooperation Treaty) filings or any other foreign filings where made at that time or, as allowed, within the following year. In addition, no continuations to this patent application or patent filings in a similar area of technology were made by the Air Force after that time.

***The Air Force has a clearly defined mechanism for judging both the technical and commercial merits of patents before any expense is incurred in filing the patents. The Air Force also had a clearly defined strategy in filing three separate patent applications for the patents that issued as the '540, '985, and '765 patents.***

5.3. '985 patent: Process for the manufacture of group III nitride targets for use in sputtering and similar equipment[100]

A patent application titled 'Process for the manufacture of group III nitride targets for use in sputtering and similar equipment' was submitted to the United States Trademark and Patent Office naming as inventors Mr. Suscavage, *et al.* from the Air Force on April 27, 1999[101]. The patent, U.S. Patent No. 6,113,985 ("the '985 patent") was granted September 5, 2000, with substantially the same claim language as when it was submitted. The patent abstract states:

> Using a GaN growth furnace, at least three different techniques can be used for forming the targets for the deposition of thin films. In the first, nitrides can be deposited as a dense coating on a target backing plate for use as a target. In this approach, the backing plate is placed near the Group III metal. During processing, the Group III metal or metal halide vaporizes and reacts with the nitrogen source to deposit a dense polycrystalline layer on the backing plate. To build up a thick layer on the backing plate, the backing plate is repeatedly placed in the processing furnace until a satisfactory thickness is attained. For the second approach, a properly shaped reaction vessel, the dense, thick Group III nitride crust that forms on top of the Group III metal during the process can be used directly or mechanically altered to meet the size requirements for a sputtering target holder. As a third approach, the Group III nitride material can be ground into a fine powder using traditional ceramic powder processing methods and then pressed to consolidate the powder into a sputtering target. The third processing option would typically lead to a low density target; however, this "green" compact can then be reinserted into the same processing apparatus that the original powder was synthesized to infiltrate the open pores with the same or another group III metal nitride. This would produce a high density, thick target.

The stated objective of this patent is embodied in claim 1 of the patent: A process for manufacturing targets of Group III nitride material by placing the ammonium halide material and

[99] Discussion with Dr. Alexander 11 May 2005.
[100] Appendix A: Slide 22
[101] Exhibit 21

a metal in a reaction chamber, and then heating the ammonium halide material to form a vapor which reacts with the metal to form a metal-nitride material. The invention was embodied three, slightly, different ways, all of which effectively have the same function: the deposition of thick poly-crystalline GaN-based materials. The primary embodiment is shown as Figure 1 in the '985 patent, which is shown in slightly modified form in Figure 12 to clarify the position of the ammonium halide and gallium source material in the reaction chamber.

In this embodiment of the '985 patent, GaN should be deposited as a dense coating on a target backing plate [28] for use as a target for PLD or sputtering. Figure 12 shows that the backing plate [28] is placed near the Group III metal source [24] with the ammonium halide physically separated. The ammonium halide vaporizes when it is heated, and the vapor is transported down the length of the reaction chamber (the red line) due to a thermal gradient created by keeping the heaters [16] and [18] at different temperatures. This creates a cooler downstream area where the backing plate [28] is located. During the process the Group III metal (or even metal halide) vaporizes and reacts with the nitrogen source (created from the ammonium halide) to deposit a dense polycrystalline layer on the backing plate. The patent states 'that the density must be high, probably above 85%' to have utility in PLD[102].




Figure 12: Schematic of the primary embodiment of the '985 patent

It was also proposed in the '985 patent to use GaN powder pressed to consolidate the powder into a low density 'green' compact (target) using ceramic processing techniques. The 'green' GaN compact is reinserted into the processing apparatus at [28] to infiltrate the open pores and produce a high density, thick target that is 'substantially 100% dense' ('985 Claim 6). It should be noted again the GaN target is only an intermediate step to producing thick GaN layers by solid vapor deposition techniques.

***The '985 patent proposes to create up to 100% dense polycrystalline GaN material using the interaction of ammonium halide vapor and liquid gallium. The end result of the practice of the '985 patent is similar to the '148 patent -a target (compact) that could be used in PLD and/or sputtering- although the processes to achieve them are different.***

5.4. '540 Patent: Process and apparatus for the growth of nitride materials[103]

A patent application titled 'Process and apparatus for the growth of nitride materials' was submitted to the United States Trademark and Patent Office by naming as inventors Meckie Harris, *et al.* from the Air Force on April 27, 1999[104]. The patent, U.S. Patent No. 6,406,540 ("the '540 patent") was granted June 18, 2002, with substantially the same claim language as when it was submitted. The patent abstract states:

> This invention provides a process and apparatus for producing products of M-nitride materials wherein M=gallium (GaN), aluminum (AlN), indium (InN), germanium (GeN), zinc (ZnN) and ternary nitrides and

[102] U.S. Patent No. 6,113,985: Column 4: lines 27-34
[103] Appendix A: Slide 23
[104] Exhibit 23

alloys such as zinc germanium nitride or indium aluminum gallium nitride. This process and apparatus produce either free-standing single crystals, or deposit layers on a substrate by epitaxial growth or polycrystalline deposition. Also high purity M-nitride powders may be synthesized. The process uses an ammonium halide such as ammonium chloride, ammonium bromide or ammonium iodide and a metal to combine to form the M-nitride which deposits in a cooler region downstream from and/or immediately adjacent to the reaction area. High purity M-nitride can be nucleated from the vapor to form single crystals or deposited on a suitable substrate as a high density material. High purity M-nitride single crystals can be grown by the direct reaction of the halide with the M-metal in a range of sizes from a few micrometers to centimeters, depending on the growth conditions. The small sized crystals are recovered as high purity M-nitride powder while the larger crystals can be prepared as substrates for electronic devices or UV/blue/green emitting diodes and lasers. The deposited layers can be used as M-nitride substrates, or targets for pulsed laser deposition (PLD), or other systems requiring high density targets. The deposition process, and subsequent density of the resulting component, is controlled by the reaction medium and by adjusting the temperature of the ammonium halide in an area near but separate from the reaction zone. Thickness of deposition on the substrates by the same process involves placement of the substrates in a suitable area in the reaction chamber and may be further controlled by the use of nitrogen, nitrogen-hydrogen mixtures or other suitable controlling gas to facilitate uniform distribution of the layer.




Figure 13: Schematic of the primary embodiment of the ‘540 patent

The stated objective of this patent is embodied in the Claim 1 of the patent: A process for forming crystalline metal-nitride (GaN) material comprising, heating a metal and ammonium halide so that it emits a reactant gas and allowing the reactant gas into contact with the metal on a support member (substrate). The GaN either forms GaN platelets that can be used as a basis for GaN substrates or as thin single crystal layers on a substrate. The differentiator for the ‘540 patent compared to the ‘148 and ‘985 patents is the ability to form continuous films that could potentially be used directly in semiconductor device structures. The patent also describes a number ways of achieving the same objective, including the use of additional carrier gas (i.e. gas flow) to dilute the ammonium halide.

The primary embodiment is shown in Figure 2, and Figure 3 as a schematic, in the ‘540 patent. Figure 2 from the ‘540 patent is shown as a slightly modified schematic in Figure 13 to clarify the position of the ammonium halide and gallium source material in the reaction chamber similar to the ‘985 patent. In this embodiment of the ‘985 patent, the reaction container [56] contains a gallium source [40] that is located separately and independently heated from an ammonium halide source [38]. The creation of ammonium halide vapor and hence the reaction rate can be controlled by this method of external heating of the ammonium chloride [32]. A suitable carrier gas [36] downstream from the halide containment area but upstream from the reaction area can control [34] dilution of the ammonium chloride to further control the reaction rate (red line). The control of the reaction rate is required to achieve thin layers needed in devices. A substrate holder [42] where material is deposited is placed downstream of the gallium source [40].

The ability to directly deposit thin layers of GaN claimed in the ‘540 patent negates the

intermediate requirement for a GaN target ('148 and '540 patents) and the use of other deposition techniques such as PLD or sputtering. This is typical of most processes for producing device quality semiconductor crystals, such as MBE and MOCVD which is the material is produced directly onto a substrate. The process claimed in the '540 patent is analogous to the halide vapor phase epitaxy (HVPE) growth technique that first produced single crystalline GaN over 30 years ago, but produces fewer toxic chemicals or byproducts. The '540 patent teaches the ability to produce both thick layers (>250 μm) similar to that needed for substrates and very thin layers (<1 μm) needed for devices.

**The '540 patent claims a method to create directly from ammonium halide vapor and liquid gallium thick and thin single crystalline GaN material, either free standing or on a substrate. The invention claimed in the '540 patent differs from the '148 and '985 patents as it does not create a target (compact) that is used in other solid vapor deposition techniques.**

5.5. '739 patent: Method and apparatus for depositing thin films of group III nitrides and other films and devices made therefrom[105]

A patent application titled 'Method and apparatus for depositing thin films of group III nitrides and other films and devices made therefore' was submitted to the United States Trademark and Patent Office naming as the inventor Dr. Alexander from the Air Force on April 27, 1999[106]. The patent, U,S. Patent No. 6,306,739 ("the '739 patent") was granted October 23, 2001, with substantially the same claim language as when it was submitted and the patent abstract states:

> In this invention, one or more metal-containing sources and one or more ammonium halides are heated such that they evaporate into a vacuum environment (except that, in MOMBE, a beam of the organometallic source compound may be created by other means) and made to impinge on a substrate. The materials interact on the substrate to form a film of the desired nitride compound or alloy; the substrate usually will be heated to promote chemical reaction and good film properties such as high crystallinity. Other sources--to provide dopant impurities like silicon or magnesium, for example--would be part of a deposition system envisioned in this invention. Multiple film layers, including quantum wells and superlattices, may be formed using this method, in addition to a single film.

The stated objective of this patent is embodied in claim 1 of the patent: A process to form material using a high vacuum, thermal evaporation apparatus, allowing ammonium halide vapor and metal vapor from separate sources to form GaN on a substrate in the same apparatus. The differentiator for the '739 patent compared to the '540 patent is the '739 patent claims



Figure 14: Schematic of the primary embodiment of the '739 patent

[105] Appendix A: Slide 24
[106] Exhibit 22

the modification of an existing growth technology, i.e. MBE (Molecular Beam Epitaxy), rather than the creation of a new growth technology. In addition, the '739 claims a process for producing thin layers of GaN in a different growth regime than the '540 patent; at high vacuum rather than near atmospheric pressure. The '739 is also differentiated from the '148 and '985 patents in the ability to form directly device structures.

The primary embodiment of the invention is shown in *Figure 3* in the '739 patent. *Figure 3* from the '739 patent is shown as a slightly modified schematic in Figure 14 to clarify the position of the ammonium halide and gallium source material in the thermal evaporation apparatus. In the MBE embodiment of the '739 patent, a beam of ammonium halide [30] would be preferably obtained from an appropriate source (effusion cell) similar to the metal sources (effusion cells) used in traditional MBE. In MBE growth system deposition takes place in an ultra-high vacuum in which materials are heated to evaporate them, and their vapors travel to, and deposit on, a substrate. The substrate is usually heated to promote chemical reaction between deposited constituents and the deposited layer takes the underlying crystalline structure of the substrate. In the apparatuses disclosed here, nitrogen is obtained from ammonium halide rather than the more commonly used nitrogen plasma source or ammonia. Each type of metal (gallium) and/or dopant requires a separate port [26] on the MBE growth system.

The unique characteristic of MBE is the ability to switch sources and produce ultra thin layers with atomic layer resolution. This means that layered structures of different types of atoms can be produced that have a significantly different behavior to thick layers of the same material. These ultra thin layers (3-6 atoms thick in GaN) when incorporated into device structures exhibit quantum mechanical behavior and, as a consequence, are known as quantum well structures.

**The '739 patent proposes a modification to an existing growth technique MBE rather than creating a new growth technology as described in '540. In the '739 patent the nitrogen for GaN growth is provided from an ammonium halide rather than from pure nitrogen ($N_2$) or ammonia ($NH_3$). The practice of the '739 patent, like the '540 patent, differs from the '148 and '985 patents as it does not create a target (compact) that is used in other solid vapor deposition techniques.**

<u>5.6. Comparison of PDR and Air Force Technology[107]</u>

At this time it is useful to complete a comparison to see if there are any similarities between Mr. Preston's technology described in the '148 patent and the Air Force technology in the '985, '540 or '739 patents. The United States Patent and Trademark Office (USPTO) have already passed judgment on this because it saw no conflict in granting all these patents. It should be noted that the Air Force patents were also granted after Mr. Preston's patent has already been published. In addition, earlier proof of invention for some of the Air Force patents (Section 5.1) did not invalidate Mr. Preston's patents. The granting of individual patents indicates that each technology is distinct and stands on the inventive contributions detailed in each patent's claim language. Moreover, Mr. Preston could not indicate where he may have made an inventive contribution to any of the Air Force technology when asked by the Air Force[108] and in his depositions. As a consequence Mr. Preston later had to license the technology from the Air

[107] Appendix A: Slides 25 and 26
[108] Exhibit 38 – Preston was asked to complete AF Form 1279 (Section 5.2)

Force for the '985 and '739 patents to gain access to them[109].

It can be seen in Figure 15 that both the starting materials and the final product are different for Mr. Preston's invention and the inventors of the Air Force. The differences in the processes have been addressed in detail elsewhere in this report. In Mr. Preston's patent, gallium nitride powder and ammonium carbonate are the starting materials, Figure 15. These materials are physically mixed and then hot pressed to form an amorphous and possibly polycrystalline gallium nitride and ammonium carbonate compact. In the Air Force's '985 and '540 patents gallium liquid and ammonium chloride are heated to form a vapor are the starting materials. The ammonium chloride vapor is then passed over the gallium liquid using a thermal gradient before some crystalline form of GaN forms in a cool region downstream from the gallium. In the '739 process, thermal beams of gallium and ammonium chloride in a high vacuum thermal evaporation apparatus impinge on a heated substrate where single crystal GaN forms. In the Air Force patents, the GaN is predominantly polycrystalline in the '985 patent, platelets or thick crystalline layers in the '540 patent, and thin crystalline layers in the '739 patent. It is concluded that there is little functional similarity in the technology patented by Mr. Preston and that patented by the Air Force.




Figure 15: A comparison of the technology patented by Mr. Preston and that of the Air Force shows that the starting materials, the process and the end product are all different.

***A comparison of the technology patented by Mr. Preston and that of the Air Force shows the starting materials, the process and the end product are different. This agrees with the assessment of the USPTO, who granted separate patents for each of these inventions.***

[109] Exhibit 35

**6. Were any of the 3 patents owned by or licensed to PDR ('148, '540, and '985) commercially valuable?**[110]

The question of the commercial value of the '148, '540, and '985 patents must be considered a number of ways, including: 1.) a consideration of the history of competing technologies; 2.) the physical properties of the final reduction of the invention (technology);, 3.) the attempts made to commercialize the technology; and 4.) the availability functionally equivalent technology that was commercially successful.




Figure 16: An approximate timeline for the development of GaN materials and devices. The key event of commercially available blue and green LEDs (blue text), the main financial driver for GaN technology, is shown relative to the report of PDR (Preston's) technology at the MRS meeting Mr. Preston (red text).

The research & development history of GaN[111] is given in Figure 16. The first report that Mr. Preston made of the Air Force work on the PLD growth of GaN using the CERAC manufactured targets was at the Fall MRS meeting in December 1997. Prior to this time, there had been extensive work over a period of more than 30 years to develop GaN materials that resulted in the commercialization of blue and green light emitting diodes (LEDs) by Nichia Corporation, Japan and others[112]. The only growth technique that has been used to commercially produce these devices has been MOCVD. The GaN LED market has sustained a compound annual growth rate (CAGR) of more than 40% since it was established, and GaN production for 2004 is estimated to be $3.2 billion[113]. The production of GaN LEDs rapidly transitioned into a commodity market in the late 1990's, requiring large-scale manufacturing and distribution facilities. GaN technology is unusual because the major contribution to the development of GaN technology was made by one individual, Dr. Shuji Nakamura from Nichia Corporation (now at UC Santa Barbara). He was recently in litigation with his previous employer relative to his inventive rights and associated compensation which settled with a payment to Dr. Nakamura of $8M[114].

The physical properties of the final reduction of the inventions (and technology) described in the '148, '540, and '985 clearly lagged behind the existing technology. All the patents were

---

[110] Appendix A: Slides 28 and 29
[111] See also Appendix C: Nakamaura Book - p. 15, Section 2.5.1.
[112] See also Appendix C: Nakamaura Book – Chapters 1 and 2
[113] www.su.pennnet.com/report_display.cfm?rep_id=162
[114] www.sslighting.net/documents/articles/news/4966.html#top

focused on the production of GaN materials rather than GaN devices, or focused on intermediate steps in producing GaN devices such as GaN targets for solid vapor deposition. In particular –

‘148 patent

- The targets produced were not of sufficient density to produce high quality layers. Key electrical and optical characterization of GaN layers was never completed.
- Commercial–device-quality semiconductor materials are not produced by PLD or sputtering techniques. These techniques are typically only used for metallization or polycrystalline growth in semiconductor processes.

‘985 patent

- No evidence that commercial quality targets were produced by the ‘985 process. If any targets were produced, they could only be used by non-commercial growth processes.

‘540 patent

- No evidence of high quality epitaxial growth of GaN and bulk GaN crystals too small (2mm x10 mm) to be commercially viable.

Mr. Preston and his business associate, Mr. Abdoullaev, despite a reasonable effort, could not commercialize his own technology (the ‘148 patent) or that licensed from the Air Force (the ‘985 and ‘540 patents) (Section 4.8). This was primarily because the three patents clearly lagged behind the existing technology making commercialization difficult[115]. The venture capital community required prototype devices that were not available[116]. A collapse in the stock market due to the ‘dot.com’ bust led to a collapse in funding opportunities.

Currently no commercially viable technology functionally equivalent to that produced by Mr. Preston or the Air Force exists in the current 2005 market place. Other researchers had produced better or similar results in the same timeframe as Mr. Preston and the Air Force that have never been commercialized.

***The attempts by Mr. Preston and his business partner to commercialize ‘148, ‘540, and ‘985 patents were unsuccessful suggesting they had little commercial value. In addition, no functionally equivalent technology has been commercialized by others.***

## 7. Why did Corning buy NZ Applied Technologies?[117]

A general description of NZ Applied Technologies (“NZAT”) is contained in the resume of one of the founders, Dr. Zhao[118]:

> NZ Applied Technologies Corporation (NZ) was founded NZ in 1992 with a vision to create new materials based active optical components for the emerging fiberoptic communication market. The company was co-founded with Dr. Norris. NZ grew from a two-person startup to a company with $5 million in revenue and over 50 employees, including 20 PhDs between 1993 and 1999. NZ’s manufacturing and development facilities occupied 25,000 square feet with a highly functional microelectronic fabrication clean room and

[115] Exhibit 10
[116] Abdoullaev 109-110: 10-24 and 1-5
[117] Appendix A: Slides 31-34
[118] Appendix E: Zhao Resume

fiber-optic component production lines. In 1999, NZ successfully developed and commercially produced the world's first non-mechanical electro-optic polarization-insensitive attenuators, which still is the fastest and smallest VOA in the market. In 2000, NZ commercially introduced solid-state polarization transform for ultra-high speed optical networks.

The technology that NZAT developed became a source of interest by Corning in early 1998 due to its application in fiberoptic communications. The investment community had a large interest in Fiber-optic communications at this time because it was the enabling infrastructure technology for broadband internet. Many companies and other organizations were looking for opportunities for investment. An initial Investment Proposal was generated by Photonic Technologies Division (PTD) in March 1998 to purchase a ~[redacted]% share of NZAT for $[redacted][119]. At this time the 1998 revenue of NZAT was $3.8 million of which >87% came from government contracts (SBIR). The primary technical analysis of why Corning had an interest in NZAT is given in the sections on 'Technology and Products' and 'Value of Intellectual Property' in the Investment Proposal. The acquisition focused on the purchase of NZAT for its [redacted][120]. The 'Technology and Products' section of the Investment Proposal describes [redacted]

[redacted]

[redacted]

[redacted]

Variable optical attenuators (VOAs) control optical signal levels throughout an optical network. NZAT's VOA controls the level of attenuation by changing the refractive index (compared to the optical density) of an electro-optic (EO) material through application of an




Figure 17: A schematic of the VOA produced by NZAT and a picture of an actual device made by NZAT circa 2000.

[119] CORNING 0003-0009
[120] Appendix D: Cohen Lightwave January 2000

electric field, Figure 17. In this instance the EO element in the VOA is based on Lead Lanthanum Zirconium Titanate (PLZT). The PLZT was made by [redacted]. The final packaged devices (Figure 17) [redacted]. [redacted]

[redacted]

[redacted][123]. The final acquisition cost for NZAT was $[redacted] with additional $[redacted] contingent in achieving product development milestones and a final $[redacted] for compensation/employee retention over four years[124]. The product development milestones were payable as Corning stock [125]with the metrics for additional payments coupled into [redacted]

After its purchase by Corning, NZ Applied Technologies described itself as Corning Applied Technologies:

> Corning (formerly NZ) Applied Technologies (CAT), a subsidiary of Corning Incorporated, is a leading developer and manufacturer of photonic components for optical telecommunications applications. The Company's product lines include Variable Attenuators and Polarization Controllers, which provide high-speed, solid state performance in a very compact package.

However, after the 'dot.com' bust occurred, the technology and marketing rights owned by CAT were acquired by Boston Applied Technologies:

> Boston Applied Technologies Incorporated (BATI) was formed in August 22, 2002 by the key management

---

[121] CORNING 0001-0311
[122] CORNING 0023-0038
[123] CORNING 0042-0112
[124] CORNING 0024
[125] CORNING 0039-0041

and technical team formerly with Corning Applied Technologies (CAT), a subsidiary of Corning Incorporated. The mission of BATI is to develop and manufacture novel materials-based devices for emerging photonic/electronic markets.

Boston Applied Technologies[126] is active in the market place today, and still sells the VOA and related technology developed by NZ Applied Technologies[127].

[redacted] ***The technology that Corning bought was eventually divested by them and bought by the existing management team at that time. The company still operates under the name of Boston Applied Technologies.***

**8. What type of GaN research were NZ Applied Technologies and SSSC pursuing?[128]**

NZ Applied Technologies

NZ Applied Technologies (NZAT) initiated a CRDA agreement with Rome Laboratory on 18th Oct. 1996[129] that focused on the growth and characterization of oxide materials. The Air Force's CRDA with NZAT was put into place about 5 months after the Air Force's CRDA with PDR (Mr. Preston). The scope of the CRDA with NZAT was clearly focused on another area of technology, oxide based materials. For example, Task 1 (Section 3.1.1) was for supply of ZnO buffer layers to NZAT. This task did not call out III-V nitride deposition, however it was included in the schedule for NZAT in case it was needed at a later date.

The CRDA with NZAT was amended on 23 Sept.1998, and Section 3.1.1 was modified to allow NZAT to specifically provide GaN to the Air Force and for the Air Force to have access to MOCVD growth equipment at NZAT. The final report for the CRDA[130] focused only on the oxide materials including PLZT (Section 7) and made no mention of any GaN based work. It is shown in these documents that NZAT had little interaction with the Air Force on GaN-based materials.

Solid State Scientific Corporation

Solid State Scientific Corporation[131] ("SSSC") has its administrative office in Hollis, NH, and currently advertises its expertise as the 'developer of the finest spectral-temporal, hyper-spectral, and LADAR imaging sensors available today'. Spectral-temporal and hyper-spectral allow the time evolution of source spectra for sub-pixel events such as flames, plumes, or flashes (i.e. missiles) to be tracked and analyzed, and this work is being funded and jointly developed by SSSC and the Air Force[132]. An imaging Laser Radar Systems is also being developed with

126 www.bostonati.com
127 Appendix D: Jiang SPIE 2004
128 Appendix A: Slide 36
129 HANSCOM 2357-2372
130 JIANG 1-15
131 www.solidstatescientific.com
132 www.solidstatescientific.com/apps/hsi/resources.php

SSSC's partners at the Air Force. There is currently no evidence on the website that SSSC is still involved with GaN research.

SSSC, as an external management company, also provided contractors and research services to the Air Force to meet its requirements for personnel that could not be employed due to civil service personnel ceilings. SSSC did not perform any GaN work other than what is sponsored in the AFRL. SSSC would typically hire existing personnel within the Air Force or place new personnel there. Then these SSSC employees would provide quarterly, annual and final reports on different contracts to SSSC. For example –

'Bulk Growth of Gallium Nitride Single Crystals'
Final Report
March 1, 1997 – September 30, 1997
Contract F30602-97-C-0092
Submitted by Mr. Bailey
Solid State Corporation

Growth of Bulk and Epitaxial Film Nitrides for High Temperatures Electronics
Final Report
14 April 1998 through 14 April 2001
Contract F196628-98-C-0043
Principal Investigator - Mr. Bailey
Technical Contract Monitor – Dr. David Bliss AFRL/SNHX

The laboratory space and equipment was owned by the Air Force, and the SSSC personnel worked on the same projects with Air Force personnel. This still appears the mode of operation. Therefore it appears that SSSC did not have had an active GaN program other than the work that it was contracted to do with the Air Force.

***NZ Applied Technologies had limited interaction with the Air Force on GaN, and SSSC interaction was limited to the supply of personnel who worked in Air Force laboratory space on Air Force equipment.***

## 9. Comments on the purpose of a work plan in a CRDA[133]

The purpose of a CRDA work plan is to define the scope of the research to be completed for the duration of the agreement. The work plan allows for the responsibilities of the different parties to be defined and necessary allocation of resources to be made. There are a number of different types of CRDA vehicles such as 'work-for-others' (funds-in) and 'work-in-kind' that function in slightly different ways. The work-for-others CRDA is where an entity (typically a company) essentially employs members of a government lab such as the Air Force to complete research for them. A 'work-in-kind' CRDA is where both parties work together, typically using their own resources. The work plan allows for the overall cost of the project to be defined. This is important so that correct payment can be made under a 'work-for-others' agreement, or the effort roughly balanced (if needed) in a 'work-in-kind' agreement. More recently, the work plans in some CRDAs have also been used as a framework to identify or call-out background intellectual property prior to initiation of the project. This ensures the parties to the agreement do not inadvertently obtain rights to pre-existing intellectual property. The User Agreement that

[133] Appendix A: Slide 38

Mr. Preston entered with INEL was a 'work-for-others' agreement, while the CRDA with the Air Force was a 'work-in-kind'.

It is for the reasons detailed above that a CRDA is typically renegotiated or amended when the scope of the original work is changed or agreement ends. A CRDA typically does not give the company immediate rights to the government's (Air Force) technology developed unless jointly invented. Even then, exclusive rights to the technology normally have to be negotiated as part of a separate license agreement. Moreover a CRDA does not allow either participant rights to commercialize each others technology. ***For example, Mr. Preston did not have any rights to commercialize the Air Force's GaN technology in general, just as the Air Force could not commercialize its PLD technology based on data from Mr. Preston's targets.***

The Air Force interaction with Mr. Preston (PDR) was typical for CRDA agreement. Mr. Preston was told targets provided by him fell outside the scope of the CRDA by Dr. Alexander on 20 January 1998[134]. The scope of the work in section of the CRDA (Appendix A) clearly defined the production of the GaN targets by a plasma deposition process, not hot pressing. The CRDA was amended to extend its lifetime (1st amendment), and was then further amended (2nd amendment) to allow the PDR produced target, retrospectively, to be part of the agreement. A separate license agreement was negotiated to give Mr. Preston (PDR) rights to associated Air Force technology that was not within the scope of the CRDA. A useful review of the operation of a number of CRDAs was published April 30, 1999, titled 'DoD Cooperative R&D Agreements: Value Added to the Mission' and is available from DTIC[135], ADA367143 (Appendix F).

**The CRDA work plan is used to define a narrow scope of research to be completed during the lifetime of an agreement. It allows the effort to have the correct resources allocated and background intellectual property of both parties to be properly identified. The original CRDA between the Air Force and PDR made no mention of either the fabrication or use of targets by the process described in the '148 patent.**

## 10. Conclusion[136]

The conclusion of this report restates the questions that were to be reviewed, and gives a short summary of the main findings.

What did Mr. Preston invent regarding GaN films?

- The primary inventive contribution of the '148 patent was the addition of an ammonium salt to GaN powder when hot pressing.
- Mr. Preston could not provide proof of invention for the '148 patent, and the first written reduction was by Dr. Peter Kong from INEL, although his inventive contribution does not appear to have been properly recognized.
- A more detailed analysis of the x-ray data brings into doubt the assertion in the '148 patent that gallium nitride is the sole discernible constituent material in the target.
- The addition of ammonium carbonate $(NH_4)_2CO_3$ to the GaN powder results in the incorporation of carbon and oxygen in the target as observed by EDAX, and would

134 Appendix E: Alexander - Management Meeting (HANSCOM 2446-2448)
135 www.dtic.mil/techtransit/refroom/crada/index.html
136 Appendix A: Slides 40-42

render it useless for semiconductor applications.

- Air Force/Preston PLD data was incomplete and inferior to that reported in the literature.
- Mr. Preston could not raise funds to commercialize the '148 patent, since any one familiar in the art would recognize deficiencies in the technology.
- The slides that Mr. Preston showed at the MRS meeting would not constitute a presentation and the data was never reviewed or published.

<u>What did the Air Force invent regarding GaN films?</u>

- The documented evidence clearly shows that the Air Force had a comprehensive program in the growth of GaN-based films using ammonium salts prior to its involvement with Mr. Preston.
- The Air Force also had a clearly defined strategy in filing three separate patent applications.
- The '985 patent proposes to create up to 100% dense polycrystalline GaN material using the interaction of ammonium halide vapor and liquid gallium.
- The '540 patent proposes to create thick and thin single crystalline GaN material directly from ammonium halide vapor and liquid gallium either free standing or on a substrate.
- The '739 patent proposes a modification to an existing growth technique MBE rather than creating a new growth technology as described in '540.
- A comparison of the technology patented by Mr. Preston and that of the Air Force shows the starting materials, the process, and the end products are different.

<u>Were any of the 3 patents owned or licensed by PDR ('148, '540, and '985) commercially valuable?</u>

- Attempts by Mr. Preston and his business partner to commercialize the three patents were unsuccessful, suggesting they had little commercial value.
- No functionally equivalent technology has been commercialized by others.

<u>Why did Corning buy NZ Applied Technologies?</u>

[redacted]

- The technology that Corning bought was eventually divested by them, and was bought by the existing management team, which still operates under the name of Boston Applied Technologies.

<u>What type of GaN research were NZ Applied Technologies and SSSC pursuing?</u>

- NZ Applied Technologies had limited interaction with the Air Force on GaN
- SSSC interaction was limited to the supply of personnel who worked in Air Force laboratory space on Air Force equipment.

<u>Comments on the Workplan in the CRDA</u>

- A CRDA work plan is used to define the scope of research to be completed during the agreement.
- The original CRDA between the Air Force and PDR made no mention of either the fabrication or use of targets by the process described in the '148 patent.

**Rate of compensation**

Dr. Ferguson is compensated on an hourly rate basis for professional services. The hourly rate for Dr. Ferguson's analysis and testimony is $300.