IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PDR, INC., Plaintiff, | ) | |
| v. | ) | No. 03-2047C (Judge George W. Miller) |
| THE UNITED STATES, Defendant. | ) | |

**PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Plaintiff herewith submits its Proposed Findings of Uncontroverted Fact for the Court's consideration.

1. On or about May 22, 1996, PDR, Inc. entered into USAF Cooperative Research and Development Agreement (hereinafter "CRADA" with Rome Laboratories (hereinafter AFRL). The term of the CRADA was for one year. Rome Laboratories is a research arm of the United States Air Force and the research under the CRADA was to be based at Hanscom Air Force Base, in Bedford, Massachusetts., (See Defendant's Appendix 1 through 13 of Defendant's Proposed Statement of Uncontroverted Fact).
2. The purpose of the CRADA was to create a gallium nitride (GaN) target, to research GaN technologies, and assist PDR, Inc. in commercializing developed technologies under the CRADA. AFRL was to provide its expertise in

characterizing the target. (See Defendant's Appendix 12 Section 4.2.1 titled Benefits to PDR, Inc.).

3. The CRADA specified that PDR, Inc. and AFRL were to attempt to create a GaN target by means of a plasma system, while researching GaN technology. (See Section 3.4 task 4 of the CRADA, of Defendant's Appendix 11).

4. In exchange for PDR investment in the technology and the creation of the target, PDR was to receive the benefits described in section 4.2 of the CRADA (See Defendant's Appendix 12).

5. While proceeding with the research of the plasma technology under the CRADA with AFRL, PDR was working under a separate CRADA with Eglin Air Force Base, Florida, signed May 2, 1996, for ceramic gun barrel research, which utilized hot pressing and plasma technology (See Appendix 1- 15), and extended under Amendment 1 (See Appendix 16 – 18)

6. Additionally, PDR entered into a User Agreement with the Department of Energy through Idaho National Laboratories, Idaho, signed June 16, 1996, for which PDR was charged $5,000.00 for technical services for the development of Plasma technology that would enhance work being performed under both the CRADA with AFRL and the CRADA with Eglin Air Force Base.(See Appendix 19-34).

7. PDR Inc., Independently subcontracted Cerac Corporation, Wisconsin, to perform an experiment that successfully made a GAN target via a hot press method. At the time of creation of the target, on or about April 14, 1997, there were no other known GAN targets of this quality available anywhere in the world (See Section 4.2.2. of Defendant's Appendix 12).

8. On May 28, 1997, the first target was given to AFRL, where PDR was building the plasma system (See Appendix 35).

9. AFRL took the target, and AFRL scientist, Michael Suscavage, initiated laser deposition / ablation experimentation with the target to create GaN films on various material. (See Appendix 207, Preston's Declaration # 11)

10. In August of 1997, Mr. Suscavage requested a second target from PDR, Inc. to enable Alvin Drehman, an AFRL scientist, to perform off axis sputtering experiments, which again was to creat GaN films on various material. (See Appendix 208 #12 of Preston's Declaration).

11. In August of 1997 produced a second target and provided it to AFRL for further research. (See Appendix 208 #13 of Preston's Declaration)

12. In November of 1997, Mr. Drehman informed PDR, Inc. that critical data from the ablation experiments was being withheld. (See Appendix 208, #14 of Preston's Declaration).

13. Mr. Drehman presented PDR, Inc. with an x-ray diffraction pattern, (Appendix 216), that was significantly more advanced in the technology development effort than the x-ray diffraction pattern Mr. Suscavage had provided to it three weeks earlier. (See Appendix 217 ) and (See Appendix 208, Preston's Declaration #15). X-Ray diffraction is a measure of the quality of the film produced using the target.

14. In December of 1997 it became public knowledge that AFRL was scheduled to close in 1999, this was confirmed by Attorney Collier AFRL (See Appendix 94 – 95, Section 4 . (See Appendix 208, #16 of Preston's Declaration).

15. In December of 1997, PDR, Inc. hired an attorney to keep the project moving forward in a positive manner. This attorney was the former head of the Intellectual Property office of AFRL at Hanscom Air Force Base, where this research was being conducted and had authored a book titled, "Technology Transfer". (See Appendix 218 -219 ).

16. In early January of 1998, PDR, Inc's attorney introduced himself to AFRL, i.e., Michael Alexander and Attorney Julian Siegel, asking for permission to submit joint proposals, to various DOD / SBIR offices, which PDR, Inc. and AFRL did. (See Appendix 42-43; Erlic's invoice telecom).

17. After submitting joint proposals with AFRL to further advance GaN Target and Application Technology, (Appendix 37 -38) in January of 1998, and two weeks after hiring an attorney, Mr. Suscavage informed PDR that the first target was of inferior grade and that he would cease his ablation experiments. Additionally this claim came after Mr. Suscavage's nine monthe of deposition / ablation experimentation. Also in early December 1997 a picture was taken and presented by AFRL showing that the condition of the first target was excellent. (See Appendix 220 and 39-40).

18. In April of 1998, after of submitting four proposals for further research to other Government Agencies, PDR asked Mr. Suscavage to return the first target for further evaluation by the Office of Naval Research, Washington, DC.

19. In April, 1998, the first target was returned to PDR with excessive damage and wear. (See Appendix 41).

20. In May of 1998, PDR was informed by Mr. Drehman that Mr. Suscavage was submitting patent applications for GaN technologies related to those that we were working with. (See Appendix 52; Erlic's Invoice notes on telecom).
21. PDR's attorney then contacted Attorneys Julian Siegel and Stan Collier of the Intellectual Property Office of AFRL at Hanscom, asking for the opportunity to review the applications to determine if PDR wished to obtain licenses for the technologies pursuant to the CRADA (See Appendix 52).
22. In May of 1998, for the first time, AFRL notified PDR, Inc.'s attorney that the targets given to AFRL were not under the CRADA and that they were given to AFRL as a gratuity. (See Appendix 69-70).
23. PDR attorney wrote back to AFRL numerous times disputing the claim of a gift and requested to know who the reviewing official was. (See Appendix 71-76).
24. In June and July of 1998 PDR's attorney was informed that, since the base was closing, AFRL did not know the reviewing official to whom all CRADA disputes were to be referred (See Appendix 69-70).
25. PDR, Inc. then wrote a letter to Major General Paul, Office of the Commander Air Force Research Laboratories, asking for assistance in finding the name of the reviewing official, followed by two further letters. PDR received a response in October 1998. (See Appendix 77-83).
26. Major General Paul's October 1998 letter listed Lester McFawn as the reviewing official (See Appendix 84).
27. On October 21, 1998 at 11:26 a.m. PDR, Inc. called Mr. McFawn at 937.255.2620 and asked him to help rectify the problem regarding the targets.

(See Appendix 85-87 {PDR, Inc.'s phone bills listing Mr. McFawn's phone number as given to Plaintiff in Appendix 84}).

28. As instructed by Mr. McFawn PDR, Inc. called Sam Rosengarten on that same day at 11:28 a.m. who was the Air Force Research Laboratory Technology Transfer Officer. Mr. Rosengarten was then assigned Mr. McFawn's duties. PDR, Inc, and Mr. Rosengarten spoke for one hour that same day (See Appendix 85-87).

29. In fact from October 1998 through September of 2000 PDR, Inc. called Mr. Rosengarten and Attorney Julian Siegel almost on a daily basis, often multiple times a day, for assistance in resolving the ongoing dispute (See Appendix 150-152 and 155 -157) {for sample of typical monthly phone bill} and Appendix 150 and 153 {Atty. Siegel's and Mr. Rosengarten's phone numbers}),.

30. In October 27, 1998, Mr. Rosengarten called AFRL and requested that they provide a written review summarizing how they had arrived at their decision.

31. In November of 1998 Michael Alexander, Chief Electromagnetic Materials Branch at AFRL responded to Mr. Rosengarten's inquiry. (Appendix 88-89).

32. PDR and its Attorney considered the response to be inaccurate at best and PDR responded to Mr. Alexander and Attorney Siegel and Sam Rosengarten (See Appendix 158-159)

33. PDR also requested the return of the second target and all of the analytical data. AFRL refused to return the second target or give it any of the analytical data for either target.(See Appendix 210 -211 Preston's Declaration # 35-36)

34. In November of 1998, because of AFRL's refusal, PDR responded with cause justification and a sum certain invoice (See Appendix 90-93).

35. In January of 1999, PDR met with AFRL's legal office and Michael Alexander in an attempt to settle the dispute. In compensation, it was agreed that PDR could review AFRL's patent applications to determine if it wanted licenses to the patents. (See Appendix 211, Preston's Declaration #37).

36. Upon review of AFRL's patent application #AFB00473 Method of Fabricating Sputter/PLD Targets for AFRL's patent #6,113,685, I found language that stated, "A gallium nitride target examined provided unsatisfactory results when used in a laser deposition process to make a thin film. When used in a sputtering process for deposition the thin film appeared satisfactory. Although the gallium nitride target was made by a proprietary process, it is believed to have been made by a pressing and sintering process." (See Appendix 197).

37. I objected to this statement about my target and the following was substituted in place thereof: "During a Cooperative Research and Development Agreement between a government laboratory and an outside partner, two gallium nitride targets were examined to determine whether they were suitable for creating thin films by the pulse laser deposition and sputtering deposition processes. Results of this testing may be enhanced by the present invention." (See Appendix 198-200).

38. Although not know at this time, Two of the inventors listed on this patent were John Bailey and Michael Callahan, both of whom were employees of Solid State Scientific Corporation, a competitor of PDR, and both of whom were working in

the Hanscom Lab and according to the patent application were given access to my target(s). (See Appendix 197).

39. In April of 1999, PDR Stan Collier, Sam Rosengarten, and others worked out a letter of understanding settling the dispute between PDR and AFRL. (See Appendix 94-95).

40. PDR, Inc. was to receive exclusive licenses to the two pending Air Force Patents. (See Appendix 94-95)

41. In September of 1999, Mr. McFawn signed the second amendment to the CRADA, which provided for the licenses and the return of the targets and the withheld data. (See Appendix 24).

42. The licenses were signed in June of 2000. (See Appendix 97-111).

43. In April of 1998, Mr. Drehman presented results of his successful use of PDR's GaN target in making GaN film via off axis sputtering to Wreght Labs, Wright Air Force Base in Ohio. (Appendix 177-190{note photo of PDR GaN target at Appendix 178}).

44. PDR has, within the past 30 days of the date hereof, discovered that in October of 1996, AFRL Rome Labs entered into a CRADA with NZ Technologies, Inc. of Woburn, Massachusetts, the purpose of which was to make thin films of various materials at AFRL's lab at Hanscom including films of GaN. (See Appendix 161-176) and Appendix 212, Preston's Declaration #46).

45. Mr. Drehman was the technology investigator for that NZ Technology, Inc. CRADA. (See Appendix 170 {section 12.1 of the CRADA}).

46. In December of 1998 during the time that AFRL refused to return PDR's targets and during the time when Mr. Drehman was conducting sputtering experimentation with target #2, Mr. Drehman together with NZ Technologies, Inc. published a paper with the Material research Society Symposium wherein they claimed to have successfully created GaN films via off axis sputtering. (See Appendix 191-195).

47. Since Mr. Drehman and NZ Technologies, Inc. were successful in making a GaN film, and since PDR's target was admittedly used for Mr. Drehman's Wright Lab presentation in April of 1998, one can only conclude that PDR's target was used since there were only two GaN targets available and a film cannot be made without a target. (See Appendix 212, Preston's Declaration #49)

48. In May of 2000, Stan Collier retired. Shortly thereafter, Mr. Collier's supervisor, Attorney Julian Siegel and PDR discovered that commercial companies and individuals including Solid State Scientific Corporation (SSSC) were working in that lab and had already been granted licenses for the pending patents.

49. Mr. Collier knew that licenses to the pending patents had already been granted to competitors of PDR, Inc. (See Appendix 112-117)

50. Mr. Collier also knew that competitors of PDR were present at the lab at Hanscom. (See Appendix 112)

51. This was the first time that Attorney Siegel, Sam Rosengarten (Mr. McFawn's agent), and PDR became aware that there were competing commercial and private entities in the lab, where it had been working for several years, who were granted

access by AFRL to its ideas, research, and property. PDR had thought they were AFRL employees. (See Appendix 213, Preston's Declaration #53)

52. In June of 2000, AFRL notified SSSC that its licenses were terminated (See Appendix 118-119).

53. In September of 2000, according to Attorney Siegel, PDR, Inc.'s exclusive licensing period began. Also, in September of 2000, the first Air Force patent was issued. (See Appendix 213, Preston's Declaration #55)

54. In October of 2000, PDR, Inc. was informed by Attorney Siegel that SSSC had refused to accept the notice of termination of its licenses. (See Appendix 213, Preston's Declaration #56)

55. In November of 2000, PDR, Inc. presented AFRL with an offer that included SSSC and others as partners in the licenses (See Appendix 120-121).

56. SSSC, having filed a joint patent with AFRL, using PDR's data (which was being withheld from PDR by AFRL) and now a competitor, notified PDR through Attorney Siegel that they had refused the offer. ( See Appendix 196 – 200 ) {wherein PDR's targets are referenced with statements that SSSC's patent could enhance the technology}).

57. In November of 2000, PDR, Inc wrote a letter to the Secretary of the Air Force for the first time requesting an investigation of this matter (See Appendix 122).

58. In December of 2000, PDR called the Secretary of the Air Force and found that they had no record of the letter. It then faxed a copy of the original letter. (See Appendix 214 Preston's Declaration #60).

59. On January 5, 2001, PDR called the Secretary of the Air Force's office again, only to find that they had lost the fax. (See Appendix 214, Preston's Declaration #61)

60. On January 31, 2001, PDR faxed a second copy of the original letter to the Secretary of the Air Force (See Appendix 122 ).

61. On January 31, 2001, PDR also submitted the same letter to the Inspector General of The Department of Defense requesting that his office investigate the matter (See Appendix 123-124).

62. In March of 2001, PDR received a letter from the Inspector General of the Department of Defense that a case file had been opened and that PDR would receive a response within 180 days (See Appendix 125 of Plaintiff's Proposed Statement of Uncontroverted Fact).

63. One year later on February 11, 2002, the Inspector General notified PDR that the investigation was complete. They then sent PDR the report which was heavily redacted... (See Appendix 126-132).

64. Additionally, in February, 2002, PDR received a second heavily redacted report from the Secretary of the Air Force Inspector General's Office. This report included additional contact information. (See Appendix 133-138).

65. In February 2002, using the contact information provided in the report, PDR called the office of the Secretary of the Air Force and spoke to Captain Reynolds, who told it to submit an invoice with supporting information to the Secretary of the Air Force. PDR did as instructed and submitted an invoice in the amount of $2.7 million (See Appendix 139-145).

66. The invoice was forwarded to the Air Force Acquisitions Office (See Appendix 146.).

67. In March, 2002, PDR, Inc. received notification from Attorney Siegel that the invoice was rejected. (See Appendix 147-149).

68. On June, 2000, General Electric Corporation was granted a patent entitled “High Pressure High Temperature Growth of Crystalline Group III metal Nitrides”. This Patent constitutes independent verification that PDR’s technology works in that it utilizes the same process and materials to manufacture GaN targets. (See Appendix 201)

Respectfully submitted,

s/ PHILIP F. FILOSA

Philip F. Filosa
P.O. Box 808
Wrentham, MA 02093
Tel.: (508) 397-0525
Email: pffilosa@netzero.net

Attorney for Plaintiff

PETER D. KEISLER
Assistant Attorney General

Jeanne E. Davidson
Director

J. Reid Prouty
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7586
Fax: (202) 514-7969

April 7, 2007

Attorneys for Defendant

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this ____th day of _________, 2007, a copy of the foregoing "PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ PHILIP F. FILOSA

Attorney for the Plaintiff.

Respectfully submitted,

s/ PHILIP F. FILOSA

Philip F. Filosa
P.O. Box 808
Wrentham, MA 02093
Tel.: (508) 397-0525
Email: pffilosa@netzero.net

Attorney for Plaintiff

PETER D. KEISLER
Assistant Attorney General

Jeanne E. Davidson
Director

J. Reid Prouty
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7586
Fax: (202) 514-7969

April 7, 2007

Attorneys for Defendant

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this ____th day of ________, 2007, a copy of the foregoing "PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ PHILIP F. FILOSA

Attorney for the Plaintiff.