Final Version Dated 3/31/2000

# LIMITED EXCLUSIVE LICENSE

***UNITED STATES OF AMERICA***

with

**PDR, Inc**

JUNE 2000

INDEX


| ARTICLE | | PAGE |
|---|---|---|
| Preamble | | 2 |
| ARTICLE 1 | Definitions | 3 |
| ARTICLE 2 | License Grant | 5 |
| ARTICLE 3 | Royalties, Royalty Report and Payment | 5 |
| ARTICLE 4 | Records, Books and Examination | 7 |
| ARTICLE 5 | License Period | 7 |
| ARTICLE 6 | Licensee's Performance | 7 |
| ARTICLE 7 | Sublicensing and Royalty Sharing | 8 |
| ARTICLE 8 | Patent Marking and Non-Endorsement | 9 |
| ARTICLE 9 | Reservation of Rights | 9 |
| ARTICLE 10 | Representations and Warranties | 9 |
| ARTICLE 11 | Progress Reports | 11 |
| ARTICLE 12 | Modification and Termination | 11 |
| ARTICLE 13 | Infringement/Litigation | 13 |
| ARTICLE 14 | Patent Maintenance Fees | 14 |
| ARTICLE 15 | Technical Assistance | 14 |
| ARTICLE 16 | Governing Law | 15 |
| ARTICLE 17 | Export Controls | 15 |
| ARTICLE 18 | Notice | 15 |

## PREAMBLE

This Limited Exclusive License Agreement, (hereinafter called "license") is made and entered into by and between the United States of America as represented by the Secretary of the Air Force (hereinafter called "LICENSOR"), and PDR, a corporation of Commonwealth of Massachusetts, having a place of business at 54 Adams Street, Foxboro, MA 02035, (hereinafter called "LICENSEE").

WITNESSETH:

Whereas, 35 U.S.C. Chapter 38 "Patent Rights In Inventions Made with Federal Assistance" and Title 37 of the Code of Federal Regulations, Part 404 entitled "Licensing of Government Owned Inventions" set forth the terms and conditions under which licenses under federally owned inventions may be granted;

Whereas, Air Force Instruction 51-303 sets forth the terms and conditions for licensing of rights in federally owned patents and patent applications vested in the United States of America in the custody of the Department of the Air Force;

Whereas, the above-cited authorities support the proposition that licensing of Government inventions will best serve the public interest when such inventions are developed to the point of practical application and made available to the public in the shortest possible time;

Whereas, LICENSOR has determined that:

(A) The interest of the Federal Government and the public will best be served by the proposed license, in view of the LICENSEE'S intentions, plans, ability to bring the licensed inventions to practical application or otherwise to promote utilization thereof by the public;

(B) *the desired practical application has not been achieved*, or is not likely expeditiously to be achieved, under any nonexclusive license which has been granted or may be granted, on the inventions;

(C) exclusive licensing is a reasonable and necessary incentive to call forth the investment of risk capital and expenditures to bring the inventions to practical application or otherwise promote utilization thereof by the public;

(E) the licensed invention may be brought to the point of practical application within the United States by exclusive licensing;

Whereas, LICENSOR has determined that the grant of this license will neither tend to substantially lessen competition nor result in undue concentration in any section of the country in any line of commerce to which the technology to be licensed relates, nor create nor maintain other situations inconsistent with the antitrust laws;

Whereas, LICENSOR and LICENSEE were developing gallium nitride (GaN) targets by means of a CRADA for application in sputter and pulsed laser deposition;

Whereas, LICENSOR has an assignments of title in U.S. Patent Application No. 09/299,928 and U.S. Patent Application No. 09/300,053;

Whereas, LICENSEE has submitted a plan to undertake the development and marketing of the licensed inventions and has expressed its intention to carry out this plan upon the granting of this license; and

Whereas, LICENSOR has considered the capabilities of LICENSEE to undertake development and marketing of the licensed invention and has found that the LICENSEE is a responsible party for negotiating this license on terms and conditions most favorable to the public interest and that to grant this exclusive license would be in the public interest;

NOW, THEREFORE, in accordance with and to the extent provided by the aforementioned authorities and in consideration of the foregoing premises and of the covenants and obligations hereinafter set forth to be well and truly performed, and other good and valuable consideration, the parties hereby agree as follows:

**ARTICLE 1** - Definitions

The parties to this license agree that the following definitions shall apply to the defined words where such words are used in this license:

1. The "LICENSED INVENTION" or "LICENSED PATENT" means the inventions as described and claimed in the following patent applications; patents, if any issued therefrom, including continuations and reissues thereof owned by the LICENSOR; in particular, the "LICENSED INVENTION" or "LICENSED PATENT" is limited to the use of GaN for the manufacture and development of

targets during the exclusive license period(s) and no such restrictions during the non-exclusive period.

U.S. Patent Application No. 09/299,928 filed on 27 April 1999, entitled "Process and Apparatus for the Growth of Nitride Materials" and U.S. Patent Application No. 09/300,053 filed 27 April 1999 entitled "Process for the Manufacture of Group III Nitride Targets for use in Sputtering and Similar Equipment."

2. "Calendar quarters" are those three month periods commencing on January 1, April 1, July 1, and October 1.

3. "License Year" - The first license year commences on the effective date of this license and extends to the start of the next calendar quarter plus the following four full calendar quarters. The second license year commences at the expiration of the first license year and extends for the next succeeding four calendar quarters. Later license years commence on the anniversary date of the start of the second license year.

4. The "effective date" of this license shall be the date of the signing of this license without modifications by the Secretary of the Air Force or his designee, after execution thereof by the LICENSEE.

5. "ROYALTY BEARING PRODUCT" means a product produced by the LICENSEE or a SUBLICENSEE incorporating the licensed invention.

6. "GROSS SALES PRICE" means the invoice price or lease income of the ROYALTY BEARING PRODUCT sold or leased by LICENSEE to an arms length buyer (or if not sold to an arms length buyer, the invoice price of a like quality and quantity of product). This includes packaging and shipping costs paid by the purchaser. Sales tax, excise tax, use tax or similar taxes are subtracted from the GROSS SALES PRICE before determining royalty.

Where the ROYALTY BEARING PRODUCT is not sold or leased separately, but is sold or leased in combination with or as part of other products, the GROSS SALES PRICE shall be calculated for the purpose of computing royalties due by applying to the GROSS SALES PRICE of each of the combined or composite products a fractional multiplier having as its denominator the total manufacturing cost of the combined or composite products (determined in accordance with LICENSEE's customary accounting procedures), and as its numerator the manufacturing cost of the included ROYALTY BEARING PRODUCT (similarly determined).

7. "LICENSED TERRITORY" means the United States of America, its territories and possessions, the Commonwealth of Puerto Rico, and the District of Columbia.

8. "Practice the licensed invention" means to make, have made, use, lease, sell, or otherwise dispose of a ROYALTY BEARING PRODUCT incorporating the licensed invention by or for the account of the LICENSEE or SUBLICENSEE.

9. "Practical application" means to manufacture or utilize the licensed invention under such conditions as to establish that its benefits are, to the extent permitted by law or Government regulation, made available to the public on reasonable terms.

10. A "subsidiary" is a legal entity that is at least 50% owned, or otherwise controlled by LICENSEE. The term "LICENSEE" includes a "subsidiary" of LICENSEE under this license. Thus a subsidiary is not an arms length buyer of Section 6 of this Article.

11. "Sublicenses" are licenses granted by the LICENSEE to a third party other than a subsidiary, to enable such third party to exploit the licensed invention for its own account.

12. "Development plan" means the plan set out in an application for license submitted to the Department of the Air Force by letter from LICENSEE to Chief, Intellectual Property Division, ESC/JAZ, dated 6 March 2000.

**ARTICLE 2** - License Grant

1. LICENSOR grants to LICENSEE a limited exclusive, royalty bearing license to practice the licensed invention in the LICENSED TERRITORY, from the effective date of this license until one year after the issuance of any licensed patent(s), and a non-exclusive, royalty bearing license thereafter until the expiration of the last patent licensed herein. An option to extend the exclusive license period in one year increments must be requested in accordance with Article 12 herein.

2. This license shall be nonassignable by LICENSEE without prior written approval of LICENSOR, except to the successor of that part of the LICENSEE'S business to which the licensed invention pertains.

**ARTICLE 3** - Royalties, Royalty Report and Payment

1. LICENSEE shall pay LICENSOR a running royalty of 5 (five) % during the period(s) of the exclusive license and otherwise 2.5 (two and half) % of the gross sales price of each ROYALTY BEARING PRODUCT sold or otherwise disposed of by LICENSEE in accordance with this license until the expiration date of the patent licensed hereunder. Payment of the royalty shall be

made at the end of each license year in the manner set forth in the following section.

Should LICENSEE otherwise use the licensed invention to earn revenue, running royalties payable to LICENSOR shall be 10 (ten) % of such revenues received from third parties, other than SUBLICENSEES, attributed to such use.

2. LICENSEE shall furnish LICENSOR with a statement in accordance with Article 18 within two months following the end of each license year, setting forth the quantity and net sales price of ROYALTY BEARING PRODUCTS sold or otherwise disposed of by LICENSEE under this license during the license year, and the royalty payment due. Payment shall accompany the statement. If no royalty is owed, the statement shall so indicate. A product shall be considered sold when billed-out, or shipped, or paid for, whichever occurs first.

3. Should LICENSEE fail to make timely payments in accordance with this license, LICENSOR may put LICENSEE on written notice of such default, and LICENSEE may remedy the default by payment of all monies due LICENSOR within one (1) month of the date of transmission of the written notice, to maintain the license in effect. Should the default not be cured by the end of said month, LICENSOR has the right to terminate this license by giving written notice of termination to LICENSEE, whereupon this license becomes terminated. However, termination for any reason does not relieve LICENSEE of the obligation to pay past royalties accrued prior to the effective date of termination.

4. Sales to or for the Government are not subject to the earned running royalties set forth hereinabove, provided that LICENSEE identifies such sales by Government contract number or other suitable evidence, submitted with the aforesaid royalty reports.

5. Should LICENSEE receive sublicensing royalty payments from SUBLICENSEES in accordance with this license, LICENSEE shall pay LICENSOR fifty (50) % of such sublicensing royalty payments along with the written royalty statement, indicating the amounts of royalties paid LICENSEE by its SUBLICENSEE during the license year.

6. All payments due LICENSOR under this license shall be made by check, payable to the Treasurer of the United States and sent to LICENSOR at the following address:

AFRL/SNF
ATTN: MICHELLE BELL
2241 Avionics Circle
Wright-Patterson AFB OH 45433-7320

**ARTICLE 4** - Records, Books and Examination

1. LICENSEE agrees to keep, for at least the six most current license years, accurate books and records of the number and type of all ROYALTY BEARING PRODUCTS sold or disposed of and all net income received under this license, the amount of sales thereof, the royalties owed LICENSOR, and all income received from any SUBLICENSEES which may be licensed hereunder.

2. LICENSOR may, on reasonable notice and not more than once a year, have its duly authorized agent or representative, inspect, check, and verify all such books and records either at LICENSEE's business premises or at a place mutually agreed upon. The agent's reports and the aforesaid royalty statements, and the information contained therein shall be maintained in confidence by LICENSOR on a best efforts basis, if labeled PROPRIETARY, for a period of three years from the date of receipt thereof and will not be subject to disclosure under the Freedom of Information Act.

**ARTICLE 5** - License Period

The limited exclusive license shall commence on the issue of the first of the licensed patent(s) for a period of one year and shall be thereafter a non-exclusive license and shall extend to the expiration date of the last U.S. Patent claiming the licensed invention. The exclusive license period may be extended by one year increments according to an option in Article 12.

**ARTICLE 6** - LICENSEE's Performance

1. In furtherance of this license, LICENSEE agrees to perform the following:

(a) Subject to LICENSEE's right to terminate this license in accordance with the provisions of Article 12.6, LICENSEE shall, on a best efforts basis, carry out the Development Plan submitted to LICENSOR by LICENSEE in its license application and shall bring the licensed invention to the point of practical application including compliance with any applicable laws and all necessary approvals from Government agencies within two (2) year from the issue of the first licensed patent of this license.

(b) Subject to LICENSEE's right to terminate this license in accordance with the provisions of Article 12.6, LICENSEE shall, on a best efforts

basis, proceed with manufacturing and will thereafter continue to make the benefits of the licensed invention readily accessible to the public for the remaining period of this license.

(c) LICENSEE agrees to report promptly to LICENSOR any change in its mailing address, name or company affiliation during the term of this license and to report promptly of its decision to discontinue making the benefits of the licensed invention reasonably accessible to the public.

(d) LICENSEE agrees that any product embodying the licensed invention or produced through the use of the licensed invention will be manufactured substantially in the United States.

**ARTICLE 7** - Sublicensing and Royalty Sharing

1. LICENSEE may grant sublicenses under this license upon terms and conditions that LICENSEE may arrange provided that:

(a) Each sublicense shall be in writing and make reference to this license and be subject to the terms and conditions thereof including the rights retained by LICENSOR under Article 9 of this license;

(b) Each sublicense shall include the condition that the sublicense shall be automatically modified or terminated or expire upon the modification, termination, or expiration of this license;

(c) Before any sublicense is issued by LICENSEE hereunder, the written approval of LICENSOR shall first be obtained for each sublicense;

(d) Within one month after the issuance or modification of any sublicense hereunder, LICENSEE shall furnish LICENSOR with a true and complete copy of the sublicense or modification thereof;

(e) The granting of any sublicense by LICENSEE shall in no way relieve LICENSEE from any of the requirements of this license; and

(f) LICENSOR's share of all royalties received by LICENSEE from its SUBLICENSEES under this license shall be fifty (50) percent, paid in accordance with Article 3.7

2. LICENSOR retains the right to require LICENSEE to grant, and LICENSEE agrees to grant promptly, sublicenses to responsible applicants on reasonable terms when necessary to fulfill health or safety needs of the public to

basis, proceed with manufacturing and will thereafter continue to make the benefits of the licensed invention readily accessible to the public for the remaining period of this license.

(c) LICENSEE agrees to report promptly to LICENSOR any change in its mailing address, name or company affiliation during the term of this license and to report promptly of its decision to discontinue making the benefits of the licensed invention reasonably accessible to the public.

(d) LICENSEE agrees that any product embodying the licensed invention or produced through the use of the licensed invention will be manufactured substantially in the United States.

**ARTICLE 7** - Sublicensing and Royalty Sharing

1. LICENSEE may grant sublicenses under this license upon terms and conditions that LICENSEE may arrange provided that:

(a) Each sublicense shall be in writing and make reference to this license and be subject to the terms and conditions thereof including the rights retained by LICENSOR under Article 9 of this license;

(b) Each sublicense shall include the condition that the sublicense shall be automatically modified or terminated or expire upon the modification, termination, or expiration of this license;

(c) Before any sublicense is issued by LICENSEE hereunder, the written approval of LICENSOR shall first be obtained for each sublicense;

(d) Within one month after the issuance or modification of any sublicense hereunder, LICENSEE shall furnish LICENSOR with a true and complete copy of the sublicense or modification thereof;

(e) The granting of any sublicense by LICENSEE shall in no way relieve LICENSEE from any of the requirements of this license; and

(f) LICENSOR's share of all royalties received by LICENSEE from its SUBLICENSEES under this license shall be fifty (50) percent, paid in accordance with Article 3.7

2. LICENSOR retains the right to require LICENSEE to grant, and LICENSEE agrees to grant promptly, sublicenses to responsible applicants on reasonable terms when necessary to fulfill health or safety needs of the public to