the extent such needs are not being reasonably satisfied by LICENSEE, its subsidiaries and SUBLICENSEES.

**ARTICLE 8** - Patent Marking and Non-Endorsement

1. LICENSEE hereby agrees to mark each ROYALTY BEARING PRODUCT with the notation "Licensed from the United States of America under pending U.S. Patent Application Numbers 09/299,928 and 09/300,053; and when a patent issues, "Licensed from the United States of America under U.S. Patent No. _______________.

2. LICENSEE agrees not to create the appearance that LICENSOR endorses LICENSEE's business or endorses or warrants its products. LICENSOR is not to be connected directly or impliedly with any advertising or promotional program of LICENSEE, except that LICENSEE may state that it is licensed under this license.

**ARTICLE 9** - Reservation of Rights

1. This license shall be subject to any license in force at the time of the grant of this license.

2. This license is expressly made subject to the irrevocable, royalty-free right of the Government of the United States to practice for governmental purposes and have practiced the licensed invention on behalf of the Government of the United States for governmental purposes and on behalf of any foreign government or international organization pursuant to any existing or future treaty or agreement with the United States.

3. After the fifth license year, LICENSOR may restrict this license to the fields of use or geographic areas, or both, in which the LICENSEE has brought the licensed invention to practical application and continues to make the benefits of the licensed invention reasonably accessible to the public.

**ARTICLE 10** - Representations and Warranties

1. LICENSOR MAKES NO REPRESENTATION OR WARRANTY AS TO THE VALIDITY OF ANY PATENT THAT HAS OR SHALL ISSUE UNDER THE LICENSED INVENTION OR OF THE SCOPE OF ANY OF THE CLAIMS THEREOF, OR THAT THE EXERCISE OF THIS LICENSE WILL NOT RESULT

IN THE INFRINGEMENT OF ANY OTHER UNITED STATES OR FOREIGN PATENT OR OTHER INTELLECTUAL PROPERTY RIGHT.

2. Nothing relating to the grant of this license, nor the grant itself, shall be construed to confer upon LICENSEE or any SUBLICENSEES hereunder, any immunity from or defense under the antitrust laws or from any charge of patent misuse, and the acquisition and use of rights pursuant to this license, shall not be immunized from the operation of State or Federal law by reason of the source of the grant.

3. Nothing contained in this license shall be interpreted to grant to LICENSEE any rights with respect to any licensed invention or patent other than the licensed invention or licensed patent.

4. LICENSOR assumes no obligation to bring or prosecute actions or suits against third parties for infringement.

5. LICENSOR assumes no obligation to furnish any know-how.

6. NEITHER LICENSOR NOR ITS EMPLOYEES ASSUMES ANY LIABILITY WHATSOEVER FROM THE EXERCISE OF THIS LICENSE. OTHER THAN AS MAY BE EXPRESSLY STATED ELSEWHERE IN THIS LICENSE, LICENSOR MAKES NO EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

7. LICENSEE shall defend, indemnify and hold LICENSOR harmless from and against all liability, demands, damages, expenses and losses for death, personal injury, illness or property damage arising out of the use by LICENSEE or its customers and other transferees of any licensed process, or out of any use, sale or other disposition of ROYALTY BEARING PRODUCTS by LICENSEE.

8. LICENSOR and LICENSEE shall notify each of information or patent(s) that become actually known to either party that would substantially interfere or compromise the execution of the Development Plan.

(a) The following LICENSOR offices shall be responsible for reporting this information or patent(s):

(1) ESC/JAZ

(2) AFRL/SNHX

(b) The following LICENSEE:

PDR, Inc.

**ARTICLE 11** - Progress Reports

1. LICENSEE agrees to submit to LICENSOR semi-annual written reports for the first two years after the effective date of this license and one year thereafter on its efforts to achieve practical application of the licensed invention in accordance with the Development Plan submitted to the Government (Air Force) by LICENSEE and on its efforts to continue to make the benefits of the licensed invention reasonably accessible to the public. These reports shall contain information within the knowledge of the LICENSEE, or which it may acquire under normal business practice, pertaining to efforts expended, including expenditures to date, and other information which LICENSOR may determine is pertinent to Government licensing activities. LICENSEE agrees to submit any report required within two (2) months after the end of each reporting period.

2. Data within these progress reports, if labeled "PROPRIETARY" on each page thereof, shall be treated on a best efforts basis as privileged, confidential information, not subject to disclosure under the Freedom of Information Act, for a period of three (3) years from the date of receipt thereof.

**ARTICLE 12** - Modification and Termination

1. LICENSOR may modify or terminate this license in whole or in part if:

(a) LICENSOR determines that LICENSEE is not executing the Development Plan submitted in its application for a license and LICENSEE cannot otherwise demonstrate to the satisfaction of LICENSOR that it has taken or can be expected to take within a reasonable time, effective steps to achieve practical application of the licensed invention; or

(b) LICENSOR determines that such action is necessary to meet requirements for public use specified by Federal regulations and such requirements are not reasonably satisfied by LICENSEE, its subsidiaries and/or SUBLICENSEES; or

(c) LICENSEE commits a substantial breach of any covenant contained in this license agreement; or

(d) LICENSEE has willfully made a false statement or willfully omitted a material fact in the aforesaid license application or in any written report required by this license; or

(e) LICENSEE intends to file a voluntary petition in bankruptcy or if a third party intends to file an involuntary petition forcing said LICENSEE into bankruptcy, if known; LICENSEE must provide notice to LICENSOR of such intention at least thirty (30) days prior to filing such petition. Failure to provide such notice shall be deemed a material, pre-petition incurable breach of this LICENSE.

2. This license may be modified or terminated upon mutual consent of both parties as evidenced in writing and signed by both parties.

3. LICENSEE may request modification of this license in writing sent to LICENSOR and stating the reasons therefor.

4. Before modifying or terminating this license for any cause, LICENSOR shall furnish LICENSEE and each SUBLICENSEE of record, a written notice of its intention to modify or terminate this license, and LICENSEE and any SUBLICENSEE shall be allowed one (1) month after receipt of the notice to remedy any breach of any covenant set forth herein or to show cause why this license shall not be modified or terminated.

5. LICENSEE has a right to appeal, in accordance with the procedures prescribed by The Judge Advocate General of the Air Force, any decision concerning the interpretation, modification or termination of this license.

6. LICENSEE may terminate this license at any time, for whatever reason, upon written notice sent to LICENSOR at least one month prior to the effective date of termination, stating LICENSEE's intention to terminate and signed by LICENSEE or its lawful agent. All rights and licenses granted herein shall cease immediately upon the effective date of such termination; and all past royalties and payments accrued up to the date of termination shall be paid to LICENSOR within two (2) months from the effective date of termination.

7. Exclusive License Option:

(a) The LICENSEE may request of the Licensor the right to exercise the option, of Article 2.1 herein, to extend the exclusive license period. This right can be granted if the LICENSEE meets the terms of b) and c) below and has taken significant steps to achieve commercialization of the LICENSED INVENTION.

(b) The option request must be delivered in writing to the Licensor during the last six months of the exclusive license period. If not so delivered, other nonexclusive licenses can be granted by the LICENSEE.

(c) A properly exercised option will extend the exclusive license period by one year. Unless otherwise agreed in advance and in writing, by the parties, the terms of the extension shall be the same as those in the first one year period of the exclusive license period. The up-front fee shall be $3,000 dollars for the initial extension, payable with the above written request, with a minimum running royalty of $2,000 dollars, which must be paid by the end of each option year, for each additional year of extension, if granted.

**ARTICLE 13** - Infringement/Litigation

1. Infringement During Non-Exclusive License Period

(a) If LICENSEE becomes aware of an infringement or has reasonable cause to believe that there has been an infringement of the licensed patent, LICENSEE shall notify LICENSOR in writing within 30 days of LICENSEE's knowledge of or the reasonable cause for belief of infringement. After such notification, LICENSOR shall have the right of enforcement of the licensed patent, at LICENSOR's own expense, pursuant to the provisions of Chapter 29 of Title 35, United States Code, or other statutes. This right includes the right to bring suit, enjoin infringement and collect damages, profits and awards of whatever nature recoverable from such infringement, and to settle any claim or suit for infringement of the licensed patent.

(b) LICENSOR shall pay LICENSEE 25% of all payments received by or on behalf of LICENSOR as a result of a judgment in or settlement of any such action after deduction of the cost of reasonable expenses, including counsel fees, court costs and other related expenses, incurred by LICENSOR in taking such action.

(c) Should LICENSEE fail to notify LICENSOR of infringement in the appropriate time frame set forth above, LICENSOR may elect to terminate or modify this license and take appropriate action on its own to enforce the patent for LICENSOR's own benefit.

(d) Each party to this license shall provide the other with all reasonable cooperation to assist the other in the prosecution of any action to enforce the licensed patent and, during pendency of such action, inform the other of all significant developments which have occurred during such action.

2. Infringement During Exclusive License Period

(a) If LICENSEE becomes aware of an infringement or has reasonable cause to believe that there has been an infringement of the licensed patent, LICENSEE shall notify LICENSOR in writing within 30 days of LICENSEE's knowledge of or the reasonable cause for belief of infringement.

After such notification, LICENSEE shall have the right of enforcement of the licensed patent, at LICENSEE's own expense, pursuant to the provisions of Chapter 29 of Title 35, United States Code, or other statutes. This right includes the right to bring suit, enjoin infringement and collect damages, profits and awards of whatever nature recoverable from such infringement, and to settle any claim or suit for infringement of the licensed patent. This right, however, is subject to the continuing right of LICENSOR and other U.S. Government Agencies to intervene.

(b) LICENSEE shall pay LICENSOR 25% of all payments received by or on behalf of LICENSEE as a result of a judgment in or settlement of any such action after deduction of the cost of reasonable expenses, including counsel fees, court costs and other related expenses, incurred by LICENSEE in taking such action.

(c) Should LICENSEE fail to (a) notify LICENSOR of infringement in the appropriate time frame set forth above or (b) take action to enforce the licensed patent within one year of notice of infringement, LICENSOR may elect to terminate or modify this license and take appropriate action on its own to enforce the patent for LICENSOR's own benefit.

(d) Each party to this license shall provide the other with all reasonable cooperation to assist the other in the prosecution of any action to enforce the licensed patent and, during pendency of such action, inform the other of all significant developments which have occurred during such action.

**ARTICLE 14 -** Patent Maintenance Fees

All patent maintenance fees shall be paid by LICENSOR unless the LICENSEE has held an exclusive license hereto for four years for the first maintenance fee, eight years for the second maintenance fee and twelve years for the third maintenance fee or has an exclusive license in effect on the anniversary of any of the above periods.

**ARTICLE 15 -** Technical Assistance

1. LICENSOR shall, upon request and at LICENSEE's expense, from time to time, make available technical assistance at its own place of business or at an agreed upon site, one or more of its appropriate technical personnel to consult with LICENSEE to further the objectives of this license. This assistance may be in the form of a cooperative research and development agreement under AFI 61-302. The availability of personnel and the number of days allocated to such assistance are within the sole discretion of LICENSOR. Should the

furnishing of such assistance be burdensome to LICENSOR, no assistance need be provided.

2 The LICENSEE shall use the glass tower of the plasma system as well as the aluminum enclosure excepting the Zerodur window for a period of one year from the effective date of this license and thereafter by agreement. This equipment being relocated from and to Hanscom AFB at no cost to the LICENSOR.

3. The PARTIES by prior written agreement shall identify any equipment or materials dedicated to technical assistance. All equipment and materials shall remain the property of the original owner and shall be so marked. Any property removed from or brought onto Hanscom AFB shall be identified by written agreement. No costs associated with this equipment or materials shall be paid by the non-owner unless otherwise agreed hereto.

**ARTICLE 16** - Governing Law

The construction, validity, performance and effect of this license for all purposes shall be governed by the laws applicable to the Government of the United States.

**ARTICLE 17** - Export Controls

The licensed invention may be subject to the Arms Control Act (22 U.S.C. 2751 et seq.) or the Export Administration Act (50 U.S.C. 2401 et seq.). Nothing in this LICENSE shall be construed to modify or rescind LICENSEE's obligations under these laws.

**ARTICLE 18** - Notice

All communications and notices required under this license shall be duly given if timely mailed by the U.S. Postal Service, certified first class mail, postage prepaid and addressed as follows:

a. If to LICENSOR:

AFRL/SNOX
Attn: Samuel Rosengarten
2241 Avionics Circle

Wright-Patterson AFB OH 45433-7320

with a copy of such correspondence to:

SAF/GCQ
1500 Wilson Blvd., Suite 304
Arlington VA 22209

and

Chief, Intellectual Property Division
ESC/JAZ
40 Wright Street
Hanscom AFB MA 01731-2903

b. If to LICENSEE:

PDR, Inc.
Attn: Kenneth Preston
54 Adams Street
Foxboro MA 02035

In Witness Thereof, the parties hereto have caused this instrument to be executed by their duly authorized representatives.

***UNITED STATES OF AMERICA***

BY [signature] DATE 6/29/00

TITLE Chief AFRL/SNH

LICENSOR

**PDR, INC.**

BY [signature] DATE 6/30/2000

TITLE President / PDR Inc

LICENSEE

Amendment To Two Assignments

Whereas the Contractor has reserved revocable nonexclusive licenses under the Patent Rights Clause, FAR 52.227-11, of contract F19628-95-C-0083, as set forth in two assignments to the Government of patent applications Serial No. 09/299,928 and Serial No. 09/300,053.

Whereas the Government has since granted an exclusive license of the applications to PDR, Inc., a Massachusetts corporation, dated 30 June 2000, (the PDR license) and wishes to increase the exclusivity of same by obtaining a temporary waiver of the above nonexclusive licenses from the Contractor.

Accordingly, the Contractor agrees to amend its above assignments by temporarily waiving its above licenses, while the PDR license is exclusive as stated below, in consideration of the Government not pursuing optional revocation of the licenses under the Patent Rights Clause.

The PDR license shall remain exclusive for at least one year from 5 September 2000, subject to renewal, for subsequent one-year periods, failing which such license will become nonexclusive.

Once the PDR license becomes nonexclusive for more than 30 consecutive days, the Contractor will automatically reacquire the nonexclusive licenses (of the above two patent applications or patents issuing thereon) on their original terms.

Agreed to this 12 day of February 2001

Solid State Scientific Corporation
Contractor

by________________________
James E Murguia, President

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PDR, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 03-2047C<br>(Judge George Miller) |

DECLARATION OF DR. ALVIN J. DREHMAN

I, Alvin J. Drehman, make the following declaration in accordance with 28 U.S.C. § 1746. I am aware that this declaration will be used in the United States Court of Federal Claims, and that this declaration is the legal equivalent to a statement under oath.

1. My name is Alvin Drehman and I am an employee of the United States Air Force ("USAF") in Massachusetts. I presently serve as a Research Scientist in the Antenna Technology Branch in the Electromagnetic Technology Division of the Sensors Directorate of the Air Force Research Laboratory ("AFRL"), Hanscom Air Force Base ("AFB"), Massachusetts. I have held this position for over 21 years.

2. I am familiar with Kenneth Preston and his company PDR, Inc. ("PDR"). Some time in 1998, at Mr. Preston's request, I performed tests upon a Gallium Nitride target ("the second target") provided by Mr. Preston, to determine whether it would be suitable for the fabrication of Gallium Nitride films using the "sputter deposition" method. I understood that Mr. Suscavage, from the Air Force Research laboratory, had previously performed pulsed laser deposition experiments upon another Gallium Nitride target ("the first target") earlier provided by PDR.

3. After initial results that appeared promising, my further experiments upon the second target determined that it was not suitable for fabrication of Gallium Nitride through the sputter deposition method. I ceased work upon it and never resumed.

4. Some time after I ceased work upon the second target, I received word that Mr. Preston desired the second target to be returned to him. I had no reason to keep it and sought to return the second target to Mr. Preston, but wanted to do so in person and desired a witness to the transaction. Despite my efforts, I was never able to arrange such a meeting with Mr. Preston. Ultimately, I provided the second target to the Hanscom Air Force Base legal office to return to Mr. Preston. To the best of my recollection, I recall being told that the second target was ultimately returned to Mr. Preston.

5. During the time that I was performing experiments upon the second target, I continually updated Mr. Preston about the results – typically within days of the experiments. I recall reading the analytic result numbers to Mr. Preston on occasion and never withholding any information from him. After I ceased work upon the second target, I had no further data to provide Mr. Preston or PDR that I had not already given him.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 18th day of July, 2007, at Hanscom AFB, Massachusetts.

s/ Alvin J. Drehman
Alvin J. Drehman